MANDEL, Respondent, vs. BYRAM and others, Receivers, Appellants.

*November 12—December 7, 1926.*

*Master and servant: Railroad clerk assaulting shipper: When railroad is liable: Retention of clerk not ratification of act if it was not within scope of his employment.*

1. Whether a railroad rate clerk was within the scope of his employment at the time of an assault upon a shipper after a disagreement concerning rates is, under the evidence, a question for the jury.  p. 451.
2. If the assault was occasioned by a personal insult rather than anything connected with the clerk's official capacity, the assault was not within the scope of his employment.  p. 452.
3. The fact that the railroad company retained the clerk in its employ after the assault is not a ratification of his act, although if it was committed while within the scope of his employment his retention might justify the jury in assessing punitory damages.  p. 452.

APPEAL by the defendants from a judgment of the circuit court for La Crosse county: R. S. COWIE, Circuit Judge. *Reversed.*

Mandel v. Byram, 191 Wis. 446.

For the appellants there were briefs by *H. J. Killilea* and *Rodger M. Trump,* both of Milwaukee, and *Paul W. Mahoney* of La Crosse, and oral argument by *Mr. Trump.*

For the respondent the cause was submitted on the brief of *Higbee & Higbee* of La Crosse.

DOERFLER, J.   This action is brought against the receivers of the Milwaukee road to recover damages for an assault and battery alleged to have been committed upon the plaintiff by one Anderson, a rate clerk in the freight office of said road, in the city of La Crosse, on the 24th day of July, 1925. The schedules or tariffs were furnished to Anderson, who in his employment was charged with the duty of applying the same to the freight shipments arriving at La Crosse. Whenever disputes arose between a consignee and the road concerning rates, the same were referred to Anderson for adjustment, and where an effort in that direction was unsuccessful, the matter was either referred to Mr. Craft, the general agent, or to his assistant, Mr. Chamberlain.

The plaintiff was the manager and the secretary and treasurer of a corporation at La Crosse known as the Badger Hide & Fur Company, and this company, among other things, dealt in junk which it had shipped to it by consignors from various parts of the country.

It appears that shortly before the date mentioned a shipment of five barrels of junk arrived in the yards of the road at La Crosse, consigned to the plaintiff's company.   Under the regulations of the road, shipments contained in barrels which were uncovered were assessed a trifle higher rate than those which were covered.   In the instant case the difference amounted to about one dollar.   Three of these barrels had been delivered to the plaintiff and stored in his warehouse, and he made the contention that the barrels were covered and that his company was entitled to the reduced rate.   He called

up Anderson by telephone and discussed the matter with him, the plaintiff claiming that the barrels were covered, Anderson claiming that they were uncovered, and neither party could convince the other of the correctness of his respective claim.   Plaintiff then notified Anderson that he would submit the matter to Mr. Chamberlain, the assistant of the general agent, for adjustment, and immediately thereafter called upon Mr. Chamberlain at the freight office.   Anderson occupied a desk about thirty feet distant from that of Chamberlain, and while the plaintiff was in the act of submitting his claim to Chamberlain, Anderson, under the undisputed evidence in the case, left his desk, walked over to Chamberlain's desk, and stated to the plaintiff that the three barrels which had been delivered to the defendants were open shipments, which the plaintiff denied, he claiming that the barrels were covered, whereupon Anderson stated that if the barrels were covered the plaintiff covered the same, meaning thereby that he covered them after the shipment was delivered, in order to obtain the reduced rate.

Up to this point there is no material conflict manifested in the evidence.   Much of the evidence as to what took place thereafter, however, is in sharp conflict, as will appear from the following extracts of the testimony of the plaintiff and Anderson.   The plaintiff testified as follows:

"I said to Mr. Chamberlain, 'There is a shipment from Joe Guese, Spring Valley, Minnesota, Mr. Anderson is trying to assess too much freight on the shipment,' and I says, 'I would like to have you straighten it out.'. While I was talking to Mr. Chamberlain, Mr. Anderson rushed over to his desk.   He says, 'I am not trying to charge any more than what is right.'   I said, 'Mr. Anderson, the barrels over to our warehouse have cloth tops.'   He jumped around like mad.   He said, 'You are a liar.'   He said, 'If there is any cloth tops you are the one who put them on.' .. . . I said, 'Mr. Anderson, I think you are mistaken.   I am surprised a man like you would take such a stand.   I won't have anything further to do with you.   I want to talk to Mr. Cham-

berlain myself.' He said, 'Never mind, I am in on this con-versation. I will strike you on the nose.' I said, 'Mr. An-derson, don't be so hasty.' Without any warning he hit me a blow right here (indicating) and my glasses fell off and he struck me right in the ear."   .  ·

Mr. Anderson testified as follows:

"My desk is about thirty feet away from Mr. Chamber-lain's desk. When he got to talking to Mr. Chamberlain I walked over that way. Mr. Chamberlain asked him . . . 'Have they all got cloth tops,' . . . and he said 'Yes, sir.' I said, 'Harry, if those barrels all have cloth tops they were put on after they got to your place.' He said, 'Mr. Cham-berlain, I am a gentleman. I didn't come over here to be insulted by that dirty, lousy pup.' I said, 'You go slow on that.' . . . He goes around the end of the desk and up to me, his fist clenched, and said, 'I am not afraid of you.' As he came toward me, with his clenched fist at me, I put my hand rather as a guard, and at the same time it took him along the side of the face, and as he struck at me I struck him a second time and gave him a side blow."

No plea of self-defense was interposed by the defendants. While other witnesses were called by the parties, the conflict in the evidence which preceded the assault is clearly set forth in the foregoing.

Defendants' counsel at the close of the evidence moved for a directed verdict, which was denied by the court. They then made a request for the submission of a special verdict containing the following questions:

"(1) Was the plaintiff injured as the result of an assault and battery committed upon him by one Anderson?

"(2) If you answer the first question 'Yes,' then answer this question: Was Anderson acting within the scope of his employment?"

The sole question submitted involved the assessment of plaintiff's damages, and the court held as a matter of law that Anderson when he committed the assault acted within the scope of his employment, and the conclusion of the court

in that respect is challenged by defendants' counsel and assigned as error.

In *Ratcliffe v. C., M. & St. P. R. Co.* 153 Wis. 281, 285, 141 N. W. 229, this court said:

"It is true that the rule is well settled that when an agent acts outside the scope of his employment his acts are not binding upon his principal. But it is not always easy to determine what acts are and what are not within the scope of employment. Whether the acts of a servant are within the scope of his employment is ordinarily a question for the jury. But when the acts are undisputed and no conflicting inferences can be drawn from the evidence, then the question becomes one of law."

If we assume Anderson's testimony as true, that the plaintiff immediately preceding the assault referred to him as a dirty, lousy pup, or that he used similar language, then we would entertain no hesitancy in holding as a matter of law that Anderson stepped aside from the scope of his employment and committed the assault for the purpose of resenting a personal insult. While the dispute originated at a time when Anderson was engaged in the performance of duties connected with his employment, the language attributed by Anderson to the plaintiff was personal in its nature, and had a tendency to provoke an assault for personal and not for official reasons. If Anderson told the truth, then the insulting and humiliating remarks of the plaintiff caused Anderson to forget momentarily his official position with the road, and transformed the relationship into a personal one; or, in other words, it resulted in a stepping aside of Anderson from the scope of his employment. The situation thus detailed has impressed us so strongly that we feel that no conflicting inferences could reasonably be deduced therefrom, and that an answer by the jury to a question in the special verdict that Anderson at the time of the assault was acting within the scope of his employment could not be permitted to stand.

It is, however, within the special province of the jury to decide whether the plaintiff's or Anderson's version be true. Looking at the occurrence from the plaintiff's viewpoint as shown by extracts from his testimony, a more doubtful situation is presented, and here reasonable men might readily differ as to whether there was or was not a shifting from Anderson's scope of employment at the time of the commission of the alleged assault. Anderson had been a trusted employee of the road for a period of upwards of twenty years, and had performed official duties as rate clerk for sixteen years. Under the evidence there can be no dispute but that he was a capable and conscientious employee; quick-tempered, it is true, but highly sensitive and conscientious with respect to the performance of his duties. Many employees placed in a position of trust are more sensitive and conscientious in matters of business intrusted to them than they are with respect to their own personal affairs. Long years of experience in a trusted official position develop and breed an official conscience, and from all the evidence in the case it could be logically inferred that Anderson belonged to this type. On the other hand, it might also be inferred that Anderson possessed a high-strung, nervous temperament; that he was easily provoked; and that he was too prone to convert an interference with his official judgment into a personal matter which he felt it his duty to resent by violence.

So that we must conclude that under the plaintiff's evidence a jury question was presented, and one of which it can readily be said the jury was peculiarly fitted and designed to determine. With the views thus expressed by this court, the question for a special verdict proposed by defendants' counsel can readily be settled by the jury in its answer, under proper instructions.

After the commission of the assault Anderson was retained by the road in his position as rate clerk, and plaint-

iff's counsel argue that regardless of whether he committed the assault in his official capacity, or whether at the time of the commission of the assault he converted the matter into one involving a personal resentment, causing him to step aside momentarily from the scope of his employment, such retention in either event amounted to a ratification and fastened liability upon the defendants as a matter of law.

With this position this court cannot agree. If Anderson committed the assault while acting within the scope of his employment, then his retention by the road might justify the jury in assessing punitory damages; on the other hand, if the assault proceeded from a personal insult which Anderson for that reason resented, then the defendants could no more be held liable than if the assault had been committed at a time when Anderson was entirely disconnected from his employment. The doctrine here involved is well expressed in 18 Ruling Case Law, 802, where it is said:

"When there is no original liability for the act of a servant, because at the time of the negligence the servant was acting in his own personal business, the master does not become liable merely by reason of the fact that he thereafter retains the servant in his employ."

See, also, *Everingham v. C., B. & Q. R. Co.* 148 Iowa, 662, 127 N. W. 1009; *Robinson v. Superior R. T. R. Co.* 94 Wis. 345, 68 N. W. 961.

*By the Court.*—The judgment of the lower court is reversed, and the cause is remanded for a new trial.