# Central Truckaway System, Inc., v. Moore.

April 22, 1947.

William H. Field, Judge.

Robert L. Page and Albert F. Reutlinger for appellant.

Doolan, Helm, Stites & Wood for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER
—Affirming.

The action was instituted by William Moore to re-cover damages for injuries sustained to his person, medical expenses incurred for his wife, and for destruction of his automobile, resulting from a collision with one of appellant's trucks on U. S. Highway 31-W near Shively, a suburb of Louisville. At the point of collision the highway is constructed of concrete and consists of two northbound and two southbound lanes of traffic. Appellee, accompanied by his wife, was proceeding northerly in one of the northbound lanes. Robert Derrett, driving one of appellant's trucks, proceeding in a southerly direction, struck an automobile parked on the berm to the west of the lane provided for southbound vehicles; the truck then veered to the east across the lanes provided for northbound traffic and collided with appellant's car with such force that when it stopped its chas-

sis was resting on top of the automobile. At the conclusion of the evidence the Trial Court overruled appellant's motion for a peremptory instruction and directed the jury to find for appellee, and under proper instructions permitted them to determine whether the personal injuries were temporary or permanent, and to fix the damages accordingly. The jury awarded damages in the sum of $9,000 for personal injuries, and $690 for medical expenses incurred by appellee in behalf of his wife and for the damage to the car.

It is conceded that the accident was caused solely by Derrett's inability to control the truck because of his drunken condition; but reversal is urged upon the grounds (1) that the Court erred in overruling appellant's motion for a peremptory instruction, because (a) the driver of appellant's truck was not acting within the scope of his employment at the time of the accident, and (b) proof that it had exercised reasonable care in selecting its servant, that it did not know he used intoxicating liquors, and could not have anticipated that he would be intoxicated at the time of the accident, exonerated the master from liability; and (2) the damages for personal injuries are excessive.

The accident occurred at a point approximately 200 yards south of the intersection of 31-W with Sanders' Lane and approximately 300 yards north of the intersection of 31-W with Sadie's Lane. Both Sanders' Lane and Sadie's Lane run in general easterly directions from 31-W, and converge at a point approximately one quarter of a mile therefrom. From that point easterly the road is known as Sadie's Lane, and Derrett lives approximately one quarter of a mile east of the point of convergence. Moore, at that time a Corporal in the United States Army, was proceeding from Camp Breckinridge, Kentucky, to his home in Hartfield, Ohio, where he intended to spend a five-day furlough preceding embarkation for overseas duty. The evidence in respect to Derrett's movements previous to the accident is not very clear. We first find him at appellant's plant located at 1401 Southwestern Parkway in the City of Louisville. From there he was instructed by appellant's dispatcher to drive the truck to Greenwood, Mississippi, a distance of 521 miles, via U. S. 31-W through Bowling Green, Kentucky, Clarksville and Memphis,

Tennessee, and Clarksdale, Mississippi. He left the plant between 5 and 5:30 o'clock p. m. on the evening the accident occurred. We next find him at his residence on Sadie's Lane, but his route thereto is not shown in the evidence. He arrived at his home between 5:30 and 6 o'clock in a drunken condition. He drove from his home while still intoxicated, the time of his departure not being fixed by the evidence. No one testified as to his movements from the time he left home until he struck the car on the west berm of 31-W and crashed into appellee's automobile at approximately 8 o'clock p. m.

Appellant argues that the mere showing that its servant stopped at his home at the commencement of a thousand mile journey is indisputable proof that he departed from the business of his master. It would then have us infer, from the mere fact that he stopped at his home, that he proceeded therefrom to 31-W by way of Sadie's Lane instead of Sanders' Lane; that he turned north on 31-W in pursuit of a purpose of his own, that he then reversed his course but did not, in law, resume his master's business until he again reached the intersection of Sadie's Lane with 31-W. The conclusion called for would require us to enter into a realm of unreasonable speculation. He arrived at his residence at the usual hour for dinner; it may have been that he stopped there for the purpose of eating dinner; had he done so, he would have saved his master an item of expense and his deviation from 31-W would have been in his master's interest, not a departure from his scope of employment. Or he may have detoured by way of his residence for some other purpose in furtherance of his master's business. But if it should be conceded that in stopping at his home he did so purely for his own convenience, we would not be justified in speculating that he traversed Sadie's Lane instead of Sanders' Lane to 31-W, or that he turned north on 31-W in further pursuit of his own pleasure and later reversed his course and turned south. But conceding, arguendo, that he did all of these things, he certainly returned to the scope of his employment when he again headed south on 31-W, because he was then on the road he was directed to take to his ultimate destination and solely, so far as this record shows, in pursuit of his master's business. The rule is best stated in the American Law Institute's Restatement

of the Law of Agency, Section 237, as follows: "If, having in mind either his master's business and his own, or only his master's business, the servant departs too far from the space or time limits, he no longer acts within the scope of employment. The same rule applies to re-entering the employment. He cannot re-enter it, however much he desires it, until he is within the flexible limits of employment. *This does not necessarily mean that he must return to the point from which he diverged when beginning to act for a purpose of his own. As he may make a detour for his own purposes without ceasing to be in the scope of employment, so in returning to the service he may re-enter the employment before reaching the limits fixed in his authorization."* (Emphasis ours.)

Certainly Derrett was within the *flexible* limits of his employment when he arrived at the place of the collision, even if he had departed from and re-entered 31-W at Sadie's Lane instead of Sanders' Lane.

Neither are we impressed with the argument that, since he was not employed to get drunk, he departed from the scope of his employment in doing so. If we should uphold this theory, the master would be exonerated in virtually every case of a servant's negligence, because generally a servant is not employed to commit an act of negligence. Some of the language employed in the opinion in Bray-Robinson Clothing Co. v. Higgins, 210 Ky. 432, 276 S. W. 129, seems to support appellant's theory. In that case the Trial Court had given a specific instruction calling the jury's attention to the evidence concerning the intoxication of the defendant's agent, and instructed them that, if the agent was drunk at the time of the accident and such drunkenness was the proximate cause of the accident, they should find for the plaintiff. The instruction was given under the provisions of Section 466, Carroll's Kentucky Statutes, now KRS 446.070, which provides: "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

In criticizing the instruction, this Court said that the Statute applied only in an action against the person

committing the crime, and that the agent's criminal act was not imputable to the master. But the opinion recites that evidence of drunkenness on the part of the servant was admissible on the question of negligence against the master. It is unnecessary for us to re-examine the Bray-Robinson opinion in respect to the fundamental soundness of the Court's decision that the instruction on the intoxication of the servant was erroneous. We now think the reason assigned in support of the decision is unsound and is not supported by the authorities cited, and in so far as the decision holds, if it does hold, that a servant in becoming intoxicated ipso facto departs from his master's business, it is overruled. And so we hold that drunkenness on the part of an agent is an act of negligence for which his master becomes liable, if the servant otherwise is acting within the scope of his employment.

Nor are we impressed with the proposition urged under 1(b), supra, viz., that the master may exonerate himself from liability for the negligence of his servant by showing that he used ordinary care in the selection of the servant. This doctrine is a part of the fellow servant rule, and is succinctly stated in Ballard's Adm'x v. Louisville & N. R. Co., 128 Ky. 826, 110 S. W. 296, 297, 33 Ky. Law Rep. 301, 16 L. R. A., N. S., 1052: "The master must exercise ordinary care in the selection of his servants and if he fails to exercise such care, *and one of the servants is injured by the incapacity of another servant,* the master is liable, but the incapacity of the *fellow servant* must relate to the duties required of him by the master." (Emphasis ours.)

But the rule has no application in cases where the injuries are inflicted by a servant upon a third person, as is pointed out in 35 Am. Jur., Sec. 548, p. 978, wherein it is said: "The rule as to the liability of a master on the ground of want of care in the selection of competent servants is a part of the fellow servant rule, and is applicable only in actions by servants against their master for injuries caused by the negligence of fellow servants."

The converse likewise is true, viz., the exercise of reasonable or ordinary care in the selection of competent servants is not a defense where liability to a third

person is predicated upon negligence of a servant under the doctrine of respondeat superior. In rejecting this defense, in Chesapeake & O. R. Co. v. Francisco, 149 Ky. 307, 148 S. W. 46, 48, 42 L. R. A., N. S., 83, the Court said: "It matters not what degree of care the railroad company may have exercised in this respect (in using ordinary care in hiring competent employees), it is still liable for the negligent or tortious act of such employe while acting within the scope of his employment. Ignorance of an employe's incompetency does not excuse it."

It is obvious the Court did not err in overruling appellant's motion for a directed verdict in its favor.

We now come to the contention that the award to Moore for personal injuries is excessive. No complaint is made of the instructions on the measure of damages, by which the jury were directed to award appellee such sum as they believed from the evidence would fairly compensate him for any pain and suffering, mental and physical, which he endured or reasonably may be expected to suffer in the future as the direct result of the accident, and that if they believed from the evidence that appellee's injuries were permanent, the jury should make such an award as would fairly compensate him for any reduction in his power to earn money. As a result of the accident, appellee suffered compound fractures of both bones of the left forearm, and in addition thereto various cuts and bruises to his body. He suffered a blow to the side of his face which may have resulted in impairment to his ability to breathe through the left nostril, although the evidence on this point is weak. Immediately after the accident he was taken to Nichols Hospital near Louisville, which at the time was being operated by the United States Army. A cast was placed on the injured arm and allowed to remain for ten days. It was then discovered that neither of the bones was in proper alignment and that an orthopedic surgical operation, designated open reduction, was necessary to be performed. This was done, and consisted of making incisions through the overlying tissue of the arm and exposing the bones to direct vision. The fragments of both bones then were pulled back into proper anatomical position and alignment with the use of special instruments. They were then held in that position with special clamps while metallic plates were placed on the surface of the bones.

Screws were applied through the plates into the respective bones both above and below the breaks. The tissue was then drawn together over the plates and the incisions closed. After this operation was performed the arm was again placed in a cast and allowed to remain for a period of approximately two weeks. The cast and stitches were then removed and another cast placed on the arm. New casts replacing the older ones were applied every thirty days over a period of approximately five months. From March until July the arm was held in a leather and metal brace, and the patient was under the constant observation of the Army Medical Corps. He was under more or less constant and at times severe pain from the time of the accident until the time the brace was removed, and suffered intermittent pain until the time of the trial, which was sixteen months after the accident occurred. At the time of the trial appellee was unable to rotate his arm fully, the medical testimony variously placing the limitation of rotary motion from five to fifty per cent. The patient at the time of the trial was unable to lift heavy objects, such as raising a window or holding a heavy dinner plate. The forearm at that time measured one-half inch less in circumference than the arm which had not been injured. Dr. Charles Wood, of Louisville, an eminent orthopedic surgeon, examined the patient shortly after the accident in October of 1944, and again on February 19, 1946, the day before the trial. During the last examination he caused X-ray pictures to be taken, which showed that inflammation of the tissue had developed at the location of the plates. All the medical witnesses testified that there was danger of infection around the plates, and if it should develop a second operation will be necessary for the purpose of removing the plates, in which event the bone and surrounding tissues would be weakened permanently. Dr. Wood testified that such would be a major operation and that again cutting into the tissue would add to the hazard of infection and would damage the soft structure of the arm. All of the doctors testifying in the case stated that the injury was permanent in varying degrees. The rule by which this Court must be governed in determining whether a verdict should be set aside because of an excessive award for damages is stated in Consolidated Coach Corporation v. Hopkins,

228 Ky. 184, 14 S. W. 2d 768, 772: "* * * a verdict of a jury will not be set aside for this cause unless the damages awarded are so great as to strike the mind on first impression as having been superinduced by passion or prejudice; or that the award so grossly exceeds the damages or injuries proved as to shock the conscience and raise an irresistible inference of having been influenced by considerations other than the law and evidence. Coupled with this is to be considered the rule that, though the verdict may be large, it will not be set aside when there is evidence reasonably supporting it."

The verdict in this case is large; and the fact that the accident was caused by extreme drunkenness on the part of appellant's servant is a consideration which could influence a jury to increase the award of damages by way of penalty. But the size of the verdict itself does not indicate that the jury took this fact into consideration; on the contrary, we think the record shows that it did not, for the following reason: Mrs. Moore filed suit against appellant in her individual capacity for injuries sustained by her as a result of the wreck. That case was not consolidated with this case, but the two were tried together by the same jury. All of the doctors who testified in respect to Mrs. Moore's injuries stated that as a result of the wreck, even sixteen months thereafter, she was in a highly nervous condition. It was further shown that following the accident she became automobile "shy." Of course her injuries, the same as her husband's, were the result of extreme drunkenness on the part of appellant's servant; yet the jury awarded her the relatively small, although we would not say inadequate, sum of $500 for her injuries. Had the jury been influenced by considerations other than those outlined in the instructions, such resort likely would have been reflected in the award made to Mrs. Moore, as well as that made to her husband. Nor is the verdict so great as to strike our minds on first or final impression as having been superinduced by passion or prejudice. An award of damages in every case must be determined by the facts peculiar to it, and, because of the variable value of the dollar, an award of the same amount at one time may be considered excessive while at another it may not. Taylor-Green Gas Co., Inc., v. Newcomb, 302 Ky. 564, 195 S. W. 2d 307. Comparable

injuries are always difficult to find in reviewing authorities. Similar injuries to the one under consideration in this case were suffered by the plaintiff in Beuttler v. Mann, 130 Cal. App. 38, 19 P. 2d 539. The jury made an award of $20,000, which, for the purpose of comparison, must be reduced by the sum of $11,500 which was the amount allocated to doctors' bills and loss of time; thus $8,500 was awarded to the plaintiff for pain, suffering, and loss of power to earn money. That verdict was rendered in the year 1933 when the value of the dollar approximately was double its value now. In Town of Hallett v. Stephens, 1927, 125 Okl. 157, 256 P. 921, the plaintiff suffered a compound fracture of the arm, infection actually had set in, and two or three operations were performed to effect a proper union of the fragments of the bone. The Court sustained an award of $9,055, when the value of the dollar was much greater than it is now. In the recent case of Webb v. Adams, 302 Ky. 335, 194 S. W. 2d 515, an award of $10,000 for pain, suffering, and permanent injuries was sustained. In that case the plaintiff sustained two broken ribs, lacerations to her body, and an injury to her kneecap. She was in a hospital ten days and confined to her bed for several weeks. She continued to suffer pain in her wrist up to the time of the trial, and the injury to the knee caused her to drag her foot in walking. The injuries sustained by the complainants in the California, Oklahoma, and last-cited Kentucky cases more nearly conform to the injuries received by appellee than those in the other cases we have reviewed; and these authorities, without exception, support our conclusion that the verdict awarded appellee is not excessive.

The judgment is affirmed.