Stephanie PONTICAS, et al.,
Respondents,

v.

K.M.S. INVESTMENTS, et al.,
Appellants,

Lakeview Realty, Inc., Defendant.

No. C7–81–1026.

Supreme Court of Minnesota.

March 25, 1983.

Lommen Nelson, Sullivan & Cole, V. Owen Nelson and Phillip A. Cole, Minneapolis, for appellants.

Lawrence D. Olson and Bruce D. Peck, St. Paul, for Stephanie Ponticas, et al.

KELLEY, Justice.

The appellants, the owner and the operator of a residential apartment complex, were found negligent by jury verdict in the hiring of a resident manager who violently sexually assaulted one of the female tenants of the complex. They appeal from the Hennepin County District Court's order for entry of judgment which awarded the tenant damages for personal injuries and her husband damages for loss of consortium. We are called upon first to determine whether Minnesota recognizes a tort action creating liability on an employer for negligence in hiring an employee; second, if so, whether in this case the evidence was sufficient to sustain the jury's verdict that appellants had breached that duty; and, third, whether criminal assaultive actions of the

employee under the circumstances of this case could be considered a superseding intervening cause of respondents' damages so as to relieve appellants from liability.[1] We affirm.

In 1978, appellant K.M.S. Investments owned an apartment complex known as Driftwood Apartments. This complex was managed by appellant Skyline Builders. In May of 1978, respondents Stephanie and Jorge Ponticas moved into a ground floor apartment in the Driftwood Apartment complex. On or about the 1st of August of that year, Dennis Graffice was employed as apartment manager by appellant Skyline Builders. As apartment manager, Graffice had general supervision over 198 apartment units. He was issued a passkey that would afford him admission into all units. On September 8, 1978, Stephanie Ponticas noticed that her refrigerator was not functioning properly and notified Graffice, who came to the apartment. Jorge Ponticas, Stephanie's husband, was a musician. When Graffice was in the apartment on September 8, he made the observation to Stephanie Ponticas that he had not seen Jorge for some time. In response, she informed him that Jorge was out of town for the week on a band job in northern Minnesota. In the early morning hours of Sunday, September 10, she was violently raped at knifepoint by a person whom she recognized to be Dennis Graffice. During the course of the sexual assault, he attempted to strangle her. Following the assault, she escaped from the apartment through a broken window and reported the incident to police. Dennis Graffice was subsequently arrested and convicted of sexual assault in the first degree and was sentenced to Stillwater State Prison. Stephanie and Jorge Ponticas commenced this lawsuit against the appellants K.M.S. Investments and Skyline Builders, alleging that they were negligent in the hiring of Dennis Graffice as manager of the Driftwood Apartments, and that as a direct result of such negligent

hiring Stephanie sustained personal injuries of a physical and psychological nature and Jorge sustained damages as a result of loss of consortium.

In 1978, Dennis Graffice was 25 years old. When he was 19, he joined the Army and served 14 months until November 3, 1973, when he received a general discharge. After his discharge from the Army, he lived in California. While in California, he was charged with burglary and receiving stolen property and convicted of the latter in 1974 and served 4½ months in jail. Shortly after his release from jail, he moved to Colorado. There he was charged with two counts of armed robbery, two counts of burglary, three counts of theft and one count theft of auto parts. As a result of plea negotiations, he was convicted of armed robbery and burglary and sentenced to prison. He was released from prison in Colorado in June of 1977 and returned to California where he lived for approximately 6 months working self-employed as operator of a tree service. In January of 1978, he, his wife and child moved to Minnesota. He obtained a job as a driver for the Spring Lake Park School Bus Company. He and his wife were also caretakers for a 24-unit apartment building where they then lived. He was "fired" from the bus company after only a month and a half for drinking on the job and apparently had also had a fight with his supervisor. In March of 1978, he got a job as a line foreman at Carter's Car Wash where his wife also worked part-time. In June of 1978, Skyline Builders placed an advertisement in the newspaper for a resident manager for the Driftwood Apartment complex. The resident manager's duties included showing and renting apartments, taking care of small repairs and other tenant complaints and overseeing other employees and generally insuring a smooth operation. Graffice and his wife answered the ad that had been placed in the newspaper and completed the standard form of

1. Respondents filed a notice of review assigning as error various actions of the trial court in striking claims and rulings on evidence. Respondents neither discussed those issues in briefs filed with this court nor in oral argument. Accordingly, we do not consider them here.

application. Delores Swanson, the property manager for Skyline Builders and the person solely responsible for hiring apartment employees, interviewed the Graffices. Later, a credit check of the Graffices was made in Minnesota and in California. It was normal for Skyline Builders to make a check on the named references, either by telephone or by mail. In the case of the Graffices, Mr. Graffice had put down on his application form two names as references, one of which did not have an address and neither of which had telephone numbers. As it turned out, the two names given were his mother and sister who resided in California. Originally, the Graffices were not the successful applicants for the vacancy. The couple that had been chosen to take over the management notified Skyline Builders that they no longer desired to do so, whereupon the Graffices were called and given 20 minutes within which to give a "yes" or "no" answer. They agreed and were hired without further investigation.

On the initial application form, Dennis Graffice indicated that he had been convicted of a crime but he described the crime as "traffic tickets." Ms. Swanson did not inquire further. She did not consider violation of traffic laws to be a crime. In fact, at the time of the application Graffice was on parole following his Colorado conviction and was being supervised by the Minnesota Department of Corrections under the interstate compact. At the trial, Graffice testified he did not voluntarily disclose his felony convictions because he wanted the job,

and he further testified that if he had been asked to sign an authorization releasing his criminal record he would have refused and no longer sought the job. He also corroborated that he was never questioned about his response to that question on the application. Ms. Swanson also testified she would not have hired Dennis Graffice had she been aware of his criminal record.

1. At the outset, we must determine whether, in a tort action, a person may recover from an employer if the person was injured by a negligently hired employee. We have recognized that a person injured by a negligently retained employee may recover damages from the employer. *Porter v. Grennan Bakeries,* 219 Minn. 14, 16 N.W.2d 906 (1945); [2] *Travelers Indemnity Co. v. Fawkes,* 120 Minn. 353, 139 N.W. 703 (1913); *Dean v. St. Paul Union Depot,* 41 Minn. 360, 43 N.W. 54 (1889).[3] The origin of the doctrine making an employer liable for negligent hiring, as well as negligent retention, arose out of the common law fellow-servant law which imposed a duty on employers to select employees who would not endanger fellow employees by their presence on the job. *See* Loftus, *Employer's Duty to Know Deficiencies of Employees,* 16 Clev-Mar.L.Rev. 143, 145 (1967). The concept of direct employer liability arising as a result of negligent hiring was later expanded to include a duty to "exercise reasonable care for the safety of members of the general public" so today it is recognized as the rule in the majority of the jurisdictions [4] and recognized as the law by

2. The rule was there recognized but not applied because there plaintiff's theory was that the employer was liable by reason of respondeat superior.

3. In reversing an order sustaining a demurrer, we stated that a depot company might be liable for employing or allowing one of its tenant's employees known to be dangerous and a vicious person in its building.

4. *See Becken v. Manpower, Inc.,* 532 F.2d 56 (7th Cir.1976); *Kendall v. Gore Properties,* 236 F.2d 673 (D.C.Cir.1956); *Texas Breeders & Racing Association v. Blanchard,* 81 F.2d 382 (5th Cir.1936); *Svacek v. Shelley,* 359 P.2d 127 (Alaska 1961); *Najera v. Southern Pacific Co.,* 191 Cal.App.2d 634, 13 Cal.Rptr. 146 (1961);

*Mallory v. O'Neil,* 69 So.2d 313 (Fla.1954); *Hines v. Bell,* 104 Ga.App. 76, 120 S.E.2d 892 (1961); *Abraham v. S.E. Onorato Garages,* 50 Haw. 628, 446 P.2d 821 (1968); *Stricklin v. Parsons Stockyard Co.,* 192 Kan. 360, 388 P.2d 824 (1964); *Strawder v. Harrall,* 251 So.2d 514 (La.App.1971); *Priest v. F.W. Woolworth Five & Ten Cent Store,* 228 Mo.App. 23, 62 S.W.2d 926 (1933); *Bennett v. T & F Distributing Co.,* 117 N.J.Super. 439, 285 A.2d 59 (1971), *cert. denied* 60 N.J. 350, 289 A.2d 795 (1972); *Vanderhule v. Berinstein,* 285 A.D. 290, 136 N.Y. S.2d 95, *modified,* 284 A.D. 1089, 136 N.Y.S.2d 349 (1954); *Wegner v. Delly-Land Delicatessen, Inc.,* 270 N.C. 62, 153 S.E.2d 804 (1967); *Mistletoe Express Service, Inc. v. Culp,* 353

Restatement (Second) Agency § 213 (1958) which states:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> \* \* \* \* \* \*
>
> (b) in the employment of improper person or instrumentalities in work involving risk of harm to others.

Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others.

The connection between the employment relationship and the plaintiff has been found sufficient by courts of other jurisdictions to impose upon a landlord a duty to use reasonable care in the hiring of an employee who may pose a threat of injury to tenants. *Kendall v. Gore Properties,* 236 F.2d 673 (D.D.C.1956); *Svacek v. Shelley,* 359 P.2d 127 (Alaska 1961); *Zerder v. Friman Holding Co.,* 153 Misc. 225, 274 N.Y.S. 588 (N.Y.Sup.Ct.1934); *La Lone v. Smith,* 39 Wash.2d 167, 234 P.2d 893 (1951). The rationale employed in those cases, as well as in similar cases involving deliverymen or others who gain access to a dwelling by virtue of their employment, is that since plaintiff comes in contact with the employee as the direct result of the employment, and since the employer receives some benefit, even if only a potential or indirect benefit, by the contact between the plaintiff and the employee, there exists a duty on the employer to exercise reasonable care for the protection of the dwelling occupant to retain in such employment only those who, so far as can be reasonably ascertained, pose no threat to such occupant.

■ We can ascertain no substantial difference in imposing a duty on an employer to use reasonable care in the initial hiring from his duty to use that care in the retention of an employee. We therefore align ourselves with the majority of those jurisdictions which recognize a claim by an injured third party for negligent hiring and with the authors of Restatement (Second) Agency, *supra,* and hold that an employer has the duty to exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, may pose a threat of injury to members of the public.[5] Here, the respondent Stephanie Ponticas met Graffice as a direct result of his employment as apartment manager, and appellants received a benefit from Graffice's employment in having a caretaker for upkeep of the property and to aid tenants with complaints of property malfunction. Therefore, we hold that these appellants owed to the tenants of the Driftwood Apartments, including these respondents, the duty of exercising reasonable care in hiring a resident manager.

2. We next address the question of whether there was sufficient evidence to support the jury's verdict that appellants

---

P.2d 9 (Okl.1959); *Guedon v. Rooney,* 160 Or. 621, 87 P.2d 209 (1939); *Wishone v. Yellow Cab Co.,* 20 Tenn.App. 229, 97 S.W.2d 452 (1936); *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978).

Some of the courts in a few jurisdictions in older cases have refused to recognize negligent hiring as an independent cause of action. *See Lewis v. Southern Pacific Co.,* 102 Ariz. 108, 425 P.2d 840 (1967); *Denver City Tramway Co. v. Cowan,* 51 Colo. 64, 116 P. 136 (1911); *Black v. Hunt,* 96 Conn. 663, 115 A. 429 (1921); *Carlson v. Connecticut Co.,* 94 Conn. 131, 108 A. 531 (1919); *Everingham v. Chicago, B. & Q. Railway Co.,* 148 Iowa 662, 127 N.W. 1009 (1910); *Central Truckaway System, Inc. v.*

*Moore,* 304 Ky. 533, 201 S.W.2d 725 (1947); *Mandel v. Byram,* 191 Wis. 446, 211 N.W. 145 (1926).

5. It should be noted that this is a direct duty running from the employer to those members of the public whom the employer might reasonably anticipate would be placed in a position of risk of injury as the result of the hiring. Thus, it is distinguishable from liability imputed to an employer as a result of the doctrine of respondeat superior. *See* Note, *The Responsibilities of Employers for the Actions of Their Employees: The Negligent Hiring Theory of Liability,* 53 Chi-Kent L.Rev. 717, 717–19 (1977); 9 U.Balt.L.Rev. 438, 439 (1979).

had breached their duty. The test we employ on this issue, as well as the proximate cause issue, is whether the jury's verdict is manifestly and decidedly contrary to the evidence as a whole. *Flom v. Flom,* 291 N.W.2d 914 (Minn.1980); *Smith v. Carriere,* 316 N.W.2d 574 (Minn.1982).

Appellants had the duty to exercise that care that a reasonable landlord would have exercised under the same or similar circumstances. The scope of the duty was commensurate with the risks of the situation. Before a breach of this duty may be found by a jury, it must be established that the employee was in fact unfit, taking into consideration the nature of the employment and the risk posed by the employee to those who foreseeably would come into association with him. It is clear that it was foreseeable that Graffice would, by virtue of his employment, associate with tenants of the complex including Stephanie Ponticas. Hindsight establishes that he, indeed, was unfit as appellants now candidly admit, but whether appellants breached their duty must be determined by their actions or omissions prior to and at the time of the hiring in ascertaining whether Graffice was a fit person to employ and to entrust with a passkey which would admit him into 198 apartment units.

The thrust of respondents' position is that (1) Graffice had a history of committing violent crimes; (2) that appellants were negligent in not making more than a superficial inquiry concerning his background, especially his criminal record; (3) that appellants failed to make any kind of reasonable investigation of Graffice's employment history, references, or Army history; and (4) that the application of the Graffices contained, or failed to contain, information that would have alerted an employer exercising reasonable care, considering the risk

of injury to tenants, to conduct a more thorough investigation to explore his fitness to be a resident manager. Appellants contend that, even if they had discovered Graffice's criminal record, the particular injury, rape, was not foreseeable because his criminal record would have failed to indicate any prior crimes involving criminal sexual conduct.

■ We first dispose of the foreseeability argument. We have often held that negligence is not to be determined by whether the particular injury was foreseeable. *Connolly v. Nicollet Hotel,* 254 Minn. 373, 381–82, 95 N.W.2d 657, 664 (1959); *Albertson v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 242 Minn. 50, 64 N.W.2d 175 (1954). The jury, as finder of fact, could have found, as it did, that it was reasonably foreseeable that a person with a history of offenses of violence could commit another violent crime, notwithstanding the history would not have shown him to ever have committed the particular type of offense. Moreover, the risk of injury being foreseeable, it is clear the tenants of an apartment complex, including Mrs. Ponticas, were foreseeable plaintiffs. *Austin v. Metropolitan Life Insurance Co.,* 277 Minn. 214, 152 N.W.2d 136 (1967).

■ The most troublesome issue is whether these appellants-employers breached their duty by subjecting these foreseeable plaintiffs to a foreseeable injury by employing an incompetent person. If the employer "knew or should have known" of the incompetence, and notwithstanding hired the employee, there would exist a breach of duty.[6] Although an employer will not be held liable for failure to discover information about the employee's incompetence that could not have been discovered

---

6. See *Abraham v. S.E. Onorato Garages,* 50 Haw. 628, 446 P.2d 821 (1968); *Strawder v. Harrall,* 251 So.2d 514 (La.App.1971); *Evans v. Morsell,* 284 Md. 160, 395 A.2d 480 (1978); *Hersh v. Kentfield Builders, Inc.,* 385 Mich. 410, 189 N.W.2d 286 (1971); *Bradley v. Stevens,* 329 Mich. 556, 46 N.W.2d 382 (1951); *Strauss v. Hotel Continental Co.,* 610 S.W.2d 109 (Mo.Ct. App.1980); *Stevens v. Lankard,* 31 A.D.2d 602, 297 N.Y.S.2d 686 (1968), *aff'd* 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339 (1969); *Stone v. Hurst Lumber Co.,* 15 Utah 2d 49, 386 P.2d 910 (1963); Note, *The Responsibilities, supra* at 726; Comment, *Negligent Hiring and Negligent Entrustment: The Case Against Exclusion,* 52 Or.L.Rev. 296, 299 (1973); 9 U.Balt.L.Rev., *supra* at 441.

by reasonable investigation,[7] the issue is whether the employer did make a reasonable investigation. The scope of the investigation is directly related to the severity of risk third parties are subjected to by an incompetent employee.[8] Although only slight care might suffice in the hiring of a yardman, a worker on a production line, or other types of employment where the employee would not constitute a high risk of injury to third persons, "a very different series of steps are justified if an employee is to be sent, after hours, to work for protracted periods in the apartment of a young woman tenant * * *." *Kendall v. Gore Properties,* 236 F.2d 673, 678 (D.D.C.1956). Likewise, when the prospective employee is to be furnished a passkey permitting admittance to living quarters of tenants, the employer has the duty to use reasonable care to investigate his competency and reliability prior to employment. *Williams v. Feather Sound, Inc.,* 386 So.2d 1238, 1240 (Fla.Dist. Ct.App.1980).[9]

We now consider respondents' claim that appellants breached their duty with respect to failing to ascertain Graffice's criminal record for crimes of violence. At the outset, we reject the contention that, as a matter of law, there exists a duty upon an employer to make an inquiry as to a prospective employee's criminal record even where it is known that the employee is to regularly deal with members of the public. *Evans v. Morsell,* 284 Md. 160, 167, 395 A.2d 480, 484 (1978). If the employer has made adequate inquiry or otherwise has a reasonably sufficient basis to conclude the employee is reliable and fit for the job, no affirmative duty rests on him to investigate the possibility that the applicant has a criminal record. There are many persons in Minnesota who have prior criminal records but who are now good citizens and competent and reliable employees. Were we to hold that an employer can never hire a person with a criminal record at the risk of later being held liable for the employee's assault, it would offend our civilized concept that society must make a reasonable effort to rehabilitate those who have erred so they can be assimilated into the community. Moreover, a rule mandating an independent criminal history investigation would counter the many worthwhile efforts of individuals, organizations and employers to aid former offenders to re-establish good citizenship, the *sine qua non* of which is gainful and productive employment. Liability of an employer is not to be predicated solely on failure to investigate criminal history of an applicant, but rather, in the totality of the circumstances surrounding the hiring, whether the employer exercised reasonable care. This is generally a jury question. Here, the jury could have found that appellants made slight effort to determine whether it was safe to hire Graffice and give him access into the living quarters of the tenants of the apartments.

7. See, e.g., Kendall v. Gore Properties, 236 F.2d 673 (D.D.C.1956); Stevens v. Lankard, 31 A.D.2d 602, 297 N.Y.S.2d 686 (1968), aff'd 25 N.Y.2d 640, 306 N.Y.S.2d 257, 254 N.E.2d 339 (1969); Stone v. Hurst Lumber Co., 15 Utah 2d 49, 386 P.2d 910 (1963); see also Loftus, Employer's Duty to Know Deficiencies of Employees, 16 Clev-Mar.L.Rev. 143, 147 (1967); Comment, Negligent Hiring, supra at 299.

8. See Kendall v. Gore Properties, 236 F.2d 673, 678 (D.D.C.1956); Williams v. Feather Sound, Inc., 386 So.2d 1238, 1240 (Fla.Dist.Ct.App. 1980); Evans v. Morsell, 284 Md. 160, 166–67, 395 A.2d 480, 484 (1978); Estate of Arrington v. Fields, 578 S.W.2d 173, 178 (Tex.Civ.App. 1979); Stone v. Hurst Lumber Co., 15 Utah 2d 49, 386 P.2d 910 (1963); Restatement (Second) Agency § 213 comment d (1958).

9. The Florida court, in Williams v. Feather Sound, Inc., 386 So.2d 1238, 1240 (Fla.Dist.Ct. App.1980), stated:

However, in view of the fact that Carter had only been employed for three weeks, we believe that Feather Sound had a duty to make a reasonable inquiry about his background before transferring him to inside work and giving him access to the townhouse passkeys. If an employer wishes to give an employee the indicia of authority to enter into the living quarters of others, it has the responsibility of first making some inquiry with respect to whether it is safe to do so. Feather Sound did not carry out this responsibility. It made no effort to contact prior employers, and it did not seek advice from Carter's references.

(footnote omitted).

■ The jury could have believed evidence presented by the respondents that appellants had made little investigation of references. Appellants did contact the owner of an apartment building where the Graffices had been resident managers for a short period of time, the car wash where Graffice had worked for 3 months, and made a credit check in California and Minnesota on the Graffices. The application shows that the Graffices had resided in Minnesota a very short time; that Graffice had received a general discharge from the Army after only 14 months of service—a period shorter than the normal term of service; and had no work history other than 3 months in Minnesota during the 5 years following his discharge. Notwithstanding the short period of Minnesota residency and voids in post-discharge work history, appellants did not contact the California references listed on the application. Had they done so, they would have learned the "references" were Graffice's mother and sister, persons generally considered to be inappropriate references. These "references" were supposed to have been people that Graffice had done work for in his independent tree service. A contact with those "references" would have indicated that he had not told the truth in that respect. Moreover, the decision to hire Graffice was hurriedly made, after appellants' first choice for the job declined the proffered employment, without further interview or other investigation. The record indicates that appellants were aware of possible risk of hiring a caretaker with a history of criminal activity in that the application form contained a question concerning the same. From the foregoing, the jury could have concluded

that appellants' limited investigation furnished an insufficient basis for a reasonable employer to conclude that Graffice was reliable and, therefore, that reasonable care required appellants to investigate further the possibility that Graffice had a criminal record. If inquiry had been made, the reason for his seemingly early discharge from the Army could have been ascertained; the reason for his lack of employment for substantially 5 years following discharge from the service could have been learned, and if learned, it would have been found that a substantial period of that time would have been accounted for because Graffice had been in jail or prison; considerable doubt about the statement on the application by Graffice that he had run a self-employed tree service in California would have arisen if two of his purported "customers-references" had been ascertained to be his mother and sister. From the foregoing, the jury could have concluded that such investigation would have alerted an employer making a reasonable investigation to make further checks of possible criminal record and a history of having committed violent crimes.

The evidence indicated that an inquiry addressed to the Minnesota Department of Corrections would have resulted in information that Graffice was on interstate parole, had committed an offense, the date and geographic location of the offense, the place of confinement and the correctional disposition.[10] Moreover, there is no evidence that the employers attempted to find out anything about Graffice's criminal history by contacting the Criminal Justice Information System section of the State Crime Bureau.[11]

---

**10.** Appellants admitted that they did not know such information could have been obtained from the Department of Corrections. Appellants claim that in the past they had attempted on various occasions to obtain criminal records of prospective employees from various police departments without success.

**11.** Even if they had done so, in 1978 it would have been impossible for appellants to have obtained Graffice's criminal record from that source. For many years preceding the enactment of Minnesota Data Practices Act in 1974, Minnesota Data Practices Act, ch. 479, 1974

Minn.Laws 1199–1204 (current version at Minn.Stat. §§ 13.01–.43 (1982)), such criminal records had been treated as private by the Bureau. When the State Crime Bureau applied for a classification of criminal records under the Act, they continued the private classification. Although the Minnesota Data Practices Act contained a provision that allowed a person to give his consent for release of his criminal record, that provision was overridden by 28 C.F.R. § 20.21 (1982), requiring that there be a federal law or local ordinance for the release of

In 1978 in Minnesota, there existed nation-wide private investigation services which, for a relatively small charge, would make a national criminal record investigation. The appellants made no effort to contact any of these investigation services.[12]

On the basis of this record, viewing the evidence in the light most favorable to the verdict, we cannot conclude this jury's verdict was manifestly and palpably contrary to the evidence as a whole. *Flom v. Flom,* 291 N.W.2d 914 (Minn.1980); *Smith v. Carriere,* 316 N.W.2d 574 (Minn.1982).

 3. Appellants next urge that, even if found negligent by reason of failure to exercise reasonable care in the hiring of Graffice, the breach of that duty was not the proximate cause of the plaintiffs' injuries. For negligence to be the proximate cause of an injury, it must appear that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was likely to result in injury to others, then he is liable for any injury proximately resulting from it, even though he could not have anticipated the particular injury which did happen. *Christianson v. Chicago, St. Paul, Minneapolis & Omaha Railway Co.,* 67 Minn. 94, 97, 69 N.W. 640, 641 (1896); *Mickelson v. Kernkamp,* 230 Minn. 448, 42

N.W.2d 18 (1950). In our view, the negligence in hiring found by the jury was clearly the proximate cause of the injury to the respondents. The negligence in hiring Graffice was the only reason he was on the premises, had contact with the tenant Mrs. Ponticas, and was provided with a passkey facilitating his entry into her apartment in order to rape her. Normally, proximate cause is for the jury to decide. *Vanderweyst v. Langford,* 303 Minn. 575, 576, 228 N.W.2d 271, 272 (1975) (per curiam).

 4. Finally, appellants contend the trial court erred in refusing to instruct the jury on superseding intervening cause. An intervening act is not superseding unless (1) its harmful effects must have occurred after the original negligence; (2) it has not been brought about by the original negligence; (3) it actively worked to bring about a result which would not otherwise have followed from the original negligence; and (4) it was not reasonably foreseeable by the original wrongdoer. *Kroeger v. Lee,* 270 Minn. 75, 78, 132 N.W.2d 727, 729–30 (1967). The inherent nature of a negligent hiring cause of action precludes the application of superseding intervening cause. By its definition, the factfinder—the jury—has already determined the injury-causing con-

such information. Title 28 prohibited the release of the information when required by employers for employment purposes. The intent was apparently to preclude employers from circumventing state and local dissemination restrictions by requesting applicants to obtain certifications that they did not have a criminal record. As the result of an amendment to the state law that became effective in 1979, Act of June 6, 1979, ch. 328, § 8, 1979 Minn.Laws 912–13 (current version at Minn.Stat. § 13.05, subd. 4 (1982)), the state provision allowing an informed consent release no longer conflicts with the federal regulations. Consequently, starting in 1979 an employer could obtain information regarding an employee's criminal record simply by requesting an informed consent release. Graffice, however, testified that had he been asked to sign an informed consent release authorizing the revelation of his criminal history, he would have refused to do so and would have no longer sought the job.

It was explained at the trial that the difference in accessibility to much of the same information—that it could have been secured from the Department of Corrections but not from the

Bureau of Criminal Apprehension—was due to the fact that the different state departments have different access classifications for the same information. Thus, this results in the anomalous situation that criminal records can be obtained from one department but not from another.

12. We note that, had appellants done so, the Colorado convictions may not have been discovered by the use of a private investigation firm for the reason that Graffice, on his application, never indicated a residency in that state, thereby providing no basis for the appellants to order a search of records in any county of Colorado. However, had appellants made inquiry of the Department of Corrections they would have learned of the Colorado crimes and further inquiry could have been made if necessary. Even assuming such investigation would have failed to uncover Graffice's Colorado convictions, the fact that a bona fide attempt had been made undoubtedly would have considerable relevancy on the question of whether appellants exercised reasonable care.

duct of the employee was foreseeable. Therefore, the fourth requirement is not present in a negligent hiring case. Moreover, in negligent hiring cases the alleged intervening cause was created by the original negligence and, accordingly, the second requirement is not met. We conclude, therefore, there was no error in the trial court's refusal to instruct the jury on superseding intervening cause.

Affirmed.

SCOTT, Justice (dissenting).

I respectfully dissent. We have never before addressed the issue of whether a person can recover from an employer for an injury caused by the criminal act of an employee, based upon negligent hiring. The concept is feasible, but should be approached very cautiously. The majority holds that an employer is financially liable for the violent crime of rape committed by an employee. The decision is extremely far-reaching and the ramifications suggested are extensive. All types of scenarios can be imagined where an employer would be liable for the crimes of another, including homicide, under this decision.

The employer's negligence in failing to investigate the criminal record and parole status of Graffice was not the proximate cause of the injury because his violent criminal act was an unforeseeable intervening efficient cause. The failure to investigate the criminal record of an applicant for employment does not render it reasonably foreseeable that the hired individual will commit a violent crime.

"Consequences which follow in unbroken sequence, *without an intervening efficient cause,* from the original negligent act, are natural and proximate; and for such consequences the wrongdoer is responsible even though he could not have foreseen the particular results which did follow." *Christianson v. Chicago, St. Paul, Minneapolis & Omaha Railway Co.,* 67 Minn. 94, 97, 69 N.W. 640, 641 (1896) (emphasis supplied). Ordinarily one can proceed on the assumption that others will obey the criminal laws, and the general rule is that the criminal act

of a third person is an intervening cause sufficient to break the chain of causation.

This situation is controlled by *Hilligoss v. Cross Companies,* 304 Minn. 546, 228 N.W.2d 585 (1975). There a landlord changed the locks on all the apartment doors and posted signs on each door indicating that the locks had been changed and that new keys were available at the office. Several items of personal property were stolen from an apartment. The tenant, who had been hospitalized for several days while the sign was posted, argued that the posting of the sign was notice to all the world that the apartment was vacant and led to the criminal act and resultant loss of the property. We upheld a grant of summary judgment for the landlord, finding that "as a matter of law, the criminal act in this case was not reasonably foreseeable and was, therefore, an intervening efficient cause." *Id.* at 548, 228 N.W.2d at 586.

Similarly in this case, I would hold that the failure of an employer to investigate the criminal record of an applicant does not render it reasonably foreseeable that the individual hired will rape a tenant.

What if an investigation into his criminal record had been made and, as the facts display, no record of sexual deviation disclosed, and the employee had still been hired? Would the taking of a chance on such an employee have spelled out negligent hiring? Although not directly applicable, Minn.Stat. § 364.03 (1982) provides that "no person shall be disqualified from public employment * * * because of a prior conviction of a crime or crimes, unless the crime or crimes for which convicted directly relate to the position of employment sought * * *." The employer should be able to rely to some extent on the criminal justice system's determination that the individual is ready again to become an active member of society.

This brings us to the second impact of the majority's decision. Such a decision will startle all employers who have been working with various successful diversionary programs such as Amicus, PORT and oth-

ers, and give them considerable financial pause before hiring persons with criminal records, or even suggesting such hiring to their fellow business associates. I would not place this added burden on either the employer or on the formerly convicted employee. The devastation can be tremendous.

Creating additional barriers to the employment of persons with criminal records gives rise to social costs the majority does not take into consideration. Undoubtedly, the odds of successfully reassimilating a former convict are significantly enhanced if that person is able to obtain employment.

I would hold that in a case of negligent hiring, an intentional, violent crime is not the foreseeable result of a failure to determine an applicant's criminal record, and is therefore not the proximate cause of the injury. I would enter judgment for the defendants.

WAHL, Justice, concurring.

I concur in the dissent of Justice Scott.