**DEERINGS WEST NURSING CENTER, A DIVISION OF HILLHAVEN CORPORATION, Appellant,**

v.

**Velma Ponder SCOTT, Appellee.**

No. 08–89–00294–CV.

Court of Appeals of Texas, El Paso.

March 14, 1990.

Rehearing Overruled May 2, 1990.

John A. "Jad" Davis, Kemp, Smith, Duncan & Hammond, Midland, for appellant.

John H. Green, Odessa, for appellee.

Before FULLER, WOODARD and KOEHLER, JJ.

OPINION

WOODARD, Justice.

This is an appeal from a judgment for $35,000.00 actual damages and $200,000.00 punitive damages, founded upon the jury's finding that the Appellant was both negligent and grossly negligent in the hiring of an unlicensed nurse employee who assaulted the Appellee in its nursing home. We affirm.

On November 2, 1986, at approximately 5:30 a.m., eighty-year-old Velma Ponder Scott came to Deerings to visit her infirm older brother. It was her habit to come at all hours, though it was contended that she had been informed to restrict her visitation to certain hours. On that particular morning, Ken Hopper, an unlicensed, approximately thirty-six-year-old, 6 foot 4 inch, nurse employee, attempted to prevent Scott from visiting. He testified that he was attempting to usher Scott from the premises when she fell while resisting. She testified that Hopper, appearing greatly agitated, yelled out that she had been told not to come before 9:00 a.m. Upon his approach, she threw up her hands but was hit on the chin. He slapped her down and followed her to the floor, pinning her there with his knee upon her chest.

Point of Error No. One alleges that there is no evidence to sustain the finding that the failure of Hopper to have a Texas nursing license was a proximate cause of Scott's damages.

In considering a "no evidence" legal insufficiency point, we consider only the evidence which tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965).

 The nursing home had a duty to exercise reasonable care in the selection of its medical staff. In Texas, it is akin to the doctrine of negligent entrustment, which places a duty on an automobile owner to determine the driving competency of a person to whom he entrusts his automobile. *Park North General Hospital v. Hickman,* 703 S.W.2d 262 (Tex.App.—San Anto-

**496**

nio 1985, writ ref'd n.r.e.). To establish the automobile owner's liability in a negligent entrustment case, there must be a showing of: (1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent or reckless driver; (3) that the owner knew or should have known to be unlicensed; (4) that the driver was negligent on the occasion in question; and (5) that the driver's negligence proximately caused the accident. *Schneider v. Esperanza Transmission Company,* 744 S.W.2d 595 (Tex. 1987). Punitive damages can be imposed if the owner of the vehicle knows or should have known that the entrusted driver was incompetent or habitually reckless, and the owner was grossly negligent in entrusting the vehicle to that driver. For entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment. *Id.* Liability of the owner does not arise out of the relationship of the parties, but is based on the theory that an automobile may become a dangerous instrumentality if placed in the hands of an incompetent or reckless driver, and that an owner is negligent who knowingly places his car in the hands of such a driver. *Butler v. Spratling,* 237 S.W.2d 793 (Tex. Civ.App.—Fort Worth), *rev'd on other grounds,* 150 Tex. 369, 240 S.W.2d 1016 (1951). Deviation from the scope of the driver's authority does not relieve the negligent entrustor from consequent liability. *Frontier Theatre, Inc. v. Whisenant,* 291 S.W.2d 395 (Tex.Civ.App.—El Paso 1956, writ dism'd by agr.).

We see no reason not to continue the analogy between negligent entrustment and negligent hiring. Tex.Rev.Civ.Stat. Ann. art. 4528c, sec. 10(a) (Vernon Supp. 1990) provides for the exclusion of nurse licensing for persons convicted of felonies or crimes of moral turpitude and (11) lack of fitness to practice by reason of mental health that may result in injury to patients. Nurse Hopper had fifty-six prior convictions for theft, which are crimes of moral turpitude. *Compton v. Jay,* 389 S.W.2d 639, 642 (Tex.1965). *Martini v. State,* 371 S.W.2d 387 (Tex.Crim.App.1963). Aggra-

vated assault on a female by a male involves moral turpitude. *Trippell v. State,* 535 S.W.2d 178 (Tex.Crim.App.1976). This would most assuredly be so when the female is eighty years of age. It is common knowledge that the bleakness and rigors of old age, drugs and the diseases of senility can cause people to become confused, irascible and cantankerous. It is predictable that elderly patients will be visited by elderly friends and family. It is reasonable to anticipate that a man of proven moral baseness would be more likely to commit a morally base act on an eighty-year-old woman. Fifty-six convictions for theft is some evidence of mental aberration. Hopper was employed not only to administer medicine, but to contend with the sometimes erratic behavior of the decrepit. It is foreseeable that a nurse tending to the needs of the aged would have to be a person of sound personality strengths and not be subject to a proven pattern of impulsive behavior. The investigative process necessary to the procurement of a Texas nursing license would have precluded the licensing of Hopper. In the hiring of an unlicensed and potentially mentally and morally unfit nurse, it is reasonable to anticipate that an injury would result as a natural and probable consequence of that negligent hiring. Point of Error No. One is overruled.

Point of Error No. Two contends there is no evidence to support the finding that the negligent hiring was a heedless and reckless disregard to the rights of others. The Texas definition of gross negligence is "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." The mental state may be inferred from actions. The test for gross negligence is both an objective and a subjective test. A plaintiff may prove a defendant's gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. In addition, a plaintiff may objectively prove a defendant's gross negligence by

proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex.1985). By consciously not requiring the presentment of a license, the Appellant consciously jeopardized the health, welfare and safety of its patients and visitors by making it possible for a mentally and morally unfit employee to create a dangerous situation. The want of care in hiring Hopper amounted to conscious indifference. Point of Error No. Two is overruled.

Judgment of the trial court is affirmed.

FULLER, Justice, concurring.

I concur in affirming the trial court's judgment but wish to further add my views since the nursing home problems in our state are of growing magnitude. When reviewing a "no evidence" challenge, an appellate court must only consider the evidence and reasonable inferences drawn therefrom, which when viewed in the most favorable light, support the jury's verdict. We must disregard all evidence and inferences to the contrary. If there is more than a scintilla of evidence to support the finding, the no evidence challenge fails. *Stafford v. Stafford*, 726 S.W.2d 14 (Tex. 1987). We, therefore, will review the evidence that the jury was entitled to believe and that which tends to support its verdict.

### FACTS

Deerings Nursing Home is an institution operated for profit in Odessa, Texas. Appellee, Velma Ponder Scott, was eighty years old when the incident giving rise to this lawsuit arose. In 1986, she had come to Odessa at the request of relatives to care for her brother, Henry Lee Ponder, and his wife. His wife was incapacitated and Henry Lee Ponder was ailing. Shortly thereafter Lee Ponder, who was older than Appellee (eighty-one—eighty-four years old) suffered a seizure requiring hospitalization. He was diagnosed as having terminal cancer of the brain and liver. Thereafter, he was placed in the Appellant nurs-

ing home to await his death. Appellee was requested by her relatives to visit and take care of him as best she could. He died some three weeks after the assault which occurred on November 2, 1986. There was testimony both ways on whether or not the nursing home had posted visiting hours. There was also testimony that visiting hours had not been posted until after the assault incident. Regardless, the jury was entitled to believe that Appellee was given "free reign" to come and go as she wished when visiting her brother.

On November 2, 1986, between 5:30 a.m. and 6:00 a.m., Appellee entered Deerings Nursing Home to see her brother as she had done many times before. As she walked down the hall, Ken Hopper, a 6 foot 4 inch male employee of Appellant, confronted her. Appellee stated:

He was so angry and his face just started with—looked like hate to me. He looked like—He looked like, I might have said, crazy man at one time.

She stated that he yelled at her; he looked "vicious." She threw up her hands to protect her face but he hit her on the chin, slapped her down on the concrete floor and got on top of her, pinning her down.

On cross-examination by Appellant she was asked:

And out of the blue totally unexpected this man attacked you?

She answered:

That's why I thought that he was on dope.

A nurse's aid testified that eighty-year-old Appellee, Velma Scott, was so drunk that she fell down and that Ken Hopper went over to pick her up. This testimony was so unbelievable that even Appellant did not urge that it should be considered by the jury. Furthermore, it was not supported by any other witnesses including Ken Hopper.

### THE HIRING OF KEN HOPPER

The following facts were before the jury in regard to the hiring of Ken Hopper.

Ken Hopper was in his thirties and 6 foot 4 inches tall. Immediately before being employed by Appellant he had been a bartender at the "Queen of Hearts" bar in Odessa, Texas. He had a male roommate who was a nursing assistant at Appellant Deerings Nursing Center. Ken Hopper testified he was hired "sight unseen" over the telephone when called by a Mrs. Parks, Director of Nursing for Appellant. Even though, the next day, he went to the nursing home to fill out the application, he still maintained he had already been hired by phone. In that application he falsely stated:

(1) That he had a Texas LVN license;
(2) That he had not been convicted of a crime.

He failed to advise that he had previously been employed in a bar or that he committed over fifty-six criminal offenses of theft. He was asked to produce his claimed California LVN license but only produced a wallet size card claiming that no other certificate was issued in California. He was then asked if he forged documents like the card that he had represented as being a California LVN license. He answered that he did not know how many he had forged but admitted forging a Texas license. He admitted to being on probation at the time of his testimony. He admitted that if a check had been made as to whether he had a Texas LVN license, the nursing home would be letting someone work there who was not licensed.

Mary Hedger was called as a witness by the Appellant. She testified she worked at Deerings Nursing Home as a nurse's aide. She stated she was unaware that Hopper had a forged LVN license. She further testified that Ken Hopper did sign for narcotics dispensed by the nursing home. She agreed that the home had an obligation to check and verify the existence of an LVN license.

Ken Hopper admitted the nursing home had an obligation to check and verify the existence of an LVN license. He was then asked, "do you know whether or not if Deerings West knew that you didn't have a Texas License, they would have permitted you to dispense narcotics to their patients?" The witness answered, "I don't know."

During the time Ken Hopper worked at Deerings, especially from April 1986 to November 2, 1986, when the incident with Appellee occurred, the Appellant made no effort to verify whether or not Ken Hopper was a Texas licensed LVN. No effort was made to check locally on his criminal record. The Director of Nursing for Deerings that hired Appellee was never called as a witness, nor was the personnel file as to Ken Hopper ever produced by any party to this lawsuit. It was well within the province of the jury to question whether Ken Hopper even had a valid California license since he was an admitted forger.

Frankly and bluntly stated, at the time of the attack on this eighty-year-old Appellee, the Appellant had on the payroll an imposter, a convicted thief, a forger and a liar. He had already been reprimanded during his employment before this incident occurred. Yet, Appellant placed Ken Hopper in a position of authority as a "supervisor."

There was an abundant amount of competent evidence before the jury that Ken Hopper should never have been employed by Appellant Deerings Nursing Center.

## NURSING HOME'S DUTY

Texas courts recognize that an employer owes a duty to the public to hire competent employees, especially where they are engaged in an occupation which could be hazardous to life and limb and requires skilled or experienced persons. The basis of responsibility under the doctrine of negligent hiring is the employer's own negligence in hiring or retaining in its employ an incompetent employee who the employer knows or by the exercise of reasonable care should have known was incompetent or unfit, and thereby, causing an unreasonable risk of harm to others. It is well settled that a master may be subject to derivative liability for exemplary damages resulting from the acts of his servant where the master was negligent in the employment of the servant. *Estate of Arrington v.*

*Fields,* 578 S.W.2d 173 (Tex.Civ.App.–Tyler 1979, writ ref'd n.r.e.).

A nursing home is under a duty to exercise a high degree of care in selecting employees. This is because many occupants of nursing homes throughout our State and nation are not only elderly but often physically and/or mentally impaired. Many are helpless, lonely, forsaken and ripe for abuse. As has been aptly stated by Roberta Gail Weatherby in 8 St. Mary's L.J. 309 (1976):

> [A]t least half of the nations nursing homes have one or more serious, life-threatening conditions and are, therefore, sub-standard. The Committee reports that in many cases patients are not treated humanely, and that they frequently encounter abuse and physical mistreatment including negligent and intentional actions which lead to injury or death.

The problem is more serious today than it was fourteen years ago when the above article was written. Nursing homes are abound with elderly patients and their elderly visiting friends and relatives. Considering the nature of its business nursing/convalescent homes owe a high degree of care in selecting competent employees and refrain from hiring the services of an unfit employee. Therefore, as in the instant case, when an unlicensed employee is negligently hired to do the work of a licensed employee and is placed in a position of authority and, as a result, injury is occasioned to a third person, the nursing home employer may be liable even though the injury was brought about by the willful act of the employee beyond the scope of his employment. 53 Am.Jur.2d sec. 423 (1970), Master and Servant. It is better stated in 57A Am.Jur.2d sec. 199 at 249 (1989), under Negligence, Generally:

> Persons who are known to have mental or physical disabilities, or who are young and inexperienced, are entitled to a degree of care exercised by others proportioned to their incapacity to protect themselves.

.　　.　　.　　.　　.

The rationale of this principle of law is that natural justice requires that greater consideration and care are due to persons known to be unable to take care of themselves than to those who are fully able to do so.

## STATUTORY ENACTMENTS

Under its police powers, the State may set up standards to be satisfied by persons who seek to engage in activities that affect public health, safety or welfare. In the exercise of this power, standards of personal fitness may be created and may be enforced by laws requiring persons who desire to engage in learned professions or in occupations requiring scientific or technical knowledge to take and pass an examination as a prerequisite to engaging in such activities. The legislature may, through appropriate laws, protect the public against incompetency, fraud and oppression where, from the nature of the business or occupation or the manner in which it is conducted, the natural consequences may be injurious to the public welfare. 51 Am.Jur.2d sec. 47 at 53 (1970), "Determination of applicant's fitness for license."

As to the importance of hiring a licensed person to perform certain duties we should first endeavor to ascertain the legislative intent from a general review of the enactments pertaining to nursing home and personnel. *Bloom v. Texas State Board of Examiners of Psychologists,* 475 S.W.2d 374 (Tex.Civ.App.—Austin 1972), *rev'd on other grounds,* 492 S.W.2d 460 (Tex.1973). In Texas, the legislative intent as to the operation of nursing homes is clearly expressed.

Tex.Rev.Civ.Stat.Ann. art. 4442c (Vernon 1976) titled "Health–Public—Convalescent and nursing homes and related institutions" states:

Section 1—"The purpose of this Act and the Licensing Agency created herein is to promote the public health, safety and welfare by providing for the development, establishment and enforcement of standards." The statute provides for licensing, annual reports, inspections, denial and revocation of license, regulation of nursing

home personnel, as well as qualifications and criminal penalties for operating without a license.

Article 4442d titled, "Nursing Home Administrators Licensure Act" provides that a person who administers, manages or supervises must be licensed. This article creates a board enforce standards, set qualifications, prescribe education and require the taking and passing of an examination. The article requires Administrators to be of "good moral character" and the board has authority to renew, suspend or revoke the license. The article also provides for criminal penalties if a nursing home administrator acts without a license.

Tex.Rev.Civ.Stat.Ann. art. 4528c (Vernon 1976), pertains to Licensed Vocational Nurses—It creates a board of nine members who must employ a full-time director of training. The statute sets educational requirements, provides for an examination and requires that the applicant for a license must present sworn evidence that he is of "good moral character." The board has the authority to revoke, deny or suspend a license.

Article 4528c has been amended and "added to" rather than shortened indicating a clear realization on the part of our state legislature of the growing seriousness of the nursing home problems in relation to specialized employees.

## CONCLUSION

The Texas statutory enactments relating to the operation of nursing homes have been broadened to provide standards from the creation of boards to oversee the examination, education to the licensing of nursing home administrators as well as LVNs. These statutes emphasize that applicants must be of "GOOD MORAL" character. The clear legislative intent is to protect the public by providing a level of fitness and competency for those placed in a position of responsibility. Appellant violated the very purpose of the licensing statutes by hiring an unfit, incompetent and certainly a person lacking "good moral character." Appellant did not stop there, but then placed him in a position of authority which not only allowed him to dispense drugs but placed him on a shift as "supervisor" resulting in the ultimate inexcusable assault on an elderly woman. Under the facts of this case, Appellant breached its duty of care in failing to validate whether or not Ken Hopper had a Texas LVN license. Ken Hopper therefore was not a trustworthy, capable, reliable person of "GOOD MORAL" character as contemplated by statute. Without qualifying as a Texas LVN he was incompetent and unfit to perform the job of a Texas LVN supervisor. The jury was entitled to decide whether or not there was a causal connection between Appellant's failure to validate the existence of Ken Hopper's Texas LVN license and the resulting injuries suffered by Appellee.

The failure of Appellant to hire a Texas LVN under the circumstances also raises a fact issue as to whether its conduct was in "heedless and reckless disregard" of the rights of others.

I agree that the judgment of the trial court should be affirmed.

KOEHLER, Justice, dissenting.

I respectfully and regretfully dissent. This is one of those cases where all the sympathies are with the Appellee. On a purely emotional basis, Appellant may not deserve "the time of day" in this appeal, but we are here to decide the points of error brought to us, in accordance with the law, as dispassionately as possible.

As found by the jury, Appellant may have been negligent, yes even grossly negligent, in its hiring practices generally and in hiring Ken Hopper in particular. Hopper's actions, taken to be true as a result of the jury finding, were unconscionable and his hiring by Appellant without an adequate background check was undoubtedly a cause-in-fact of Appellee's injuries and damages. However, cause-in-fact is only a part of a necessary proximate cause finding in order to establish liability in both ordinary and gross negligence cases. A finding of proximate cause requires both (1) cause-in-fact, and (2) foreseeability. *Farley v. M.M. Cattle Company*, 529 S.W.2d 751 (Tex.1975); *Bell v. Fore*, 419

S.W.2d 686, 690 (Tex.Civ.App.—Texarkana 1967), *aff'd sub nom., Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968); *Texas American Bank v. Boggess,* 673 S.W.2d 398 (Tex. App.—Fort Worth 1984, writ dism. by agr.).

The majority attempts to establish the necessary foreseeability through the licensing requirements of the Licensed Vocational Nurses Act, Tex.Rev.Civ.Stat.Ann. art. 4528c, sec. 10(a) (Vernon Supp.1990), which *permits* but does not *require* the board of examiners to refuse to issue or renew a license, or to revoke a license, of anyone who has been convicted of a felony or a misdemeanor involving moral turpitude. The majority concludes that Hopper's past numerous theft (hot check) convictions, being crimes involving moral turpitude, should have given Appellant notice of Hopper's propensity to commit other crimes involving moral turpitude, such as assaulting elderly women visitors to the nursing home. Conceding that theft by check is a crime involving moral turpitude, simple assault clearly is not. *Handy v. State,* 136 Tex.Crim. 208, 126 S.W.2d 30 (1938).

The analogy of this negligent hiring case to a negligent entrustment of automobile case by the majority is misplaced. The owner who negligently entrusted his automobile to an unlicensed driver would *not* be liable, at least on that theory, for assaultive injuries to a customer or manager of a store which the driver had entered to make a purchase unless the owner knew or should have known that the driver had a propensity for violence. Whether Hopper was properly licensed by Texas as an LVN or whether he had been convicted on a number of hot check charges would tell his employer, the Appellant, nothing about the possibility that he might assault someone who was trying to visit a patient. The majority is relying on cause-in-fact, not foreseeability.

The test for foreseeability is whether an employer of ordinary prudence and intelligence should have anticipated the danger to others by its negligence. *Clark v. Waggoner,* 452 S.W.2d 437, 440 (Tex.1970). In this case, the "danger" was an assault by

Hopper on a visitor, and the "negligence" was the employer's failure to verify Hopper's Texas LVN license or to discover his past theft convictions. There is no evidence in the record that Hopper had an aggressive nature, had been involved in any altercations at the nursing home or in previous employment, or had a propensity for violence. "A prior or remote cause cannot be made the basis for an action for damages if it [did] nothing more than furnish the condition or give rise to the occasion which [made] the injury possible, if such injury is the result of some other cause which reasonable minds would not have anticipated, even though the injury would not have occurred *but for* such condition." [Emphasis Added.] *Bell,* 419 S.W.2d at 691.

Several jurisdictions have addressed the proximate cause question in the negligent hiring context and have concluded that the foreseeability prong is not satisfied unless the background of the employee reasonably indicated a vicious or violent behavior likely to result in the type of injury sustained by the plaintiff. *Hersh v. Kentfield Builders, Inc.,* 385 Mich. 410, 189 N.W.2d 286 (1971); *Lacy v. District of Columbia,* 424 A.2d 317 (D.C.App.1980). In *Lacy,* the court said that negligence in hiring requires foreseeability of the specific type of harm done to plaintiff. 424 A.2d at 323. In that case it was a janitor who sexually assaulted a child at school. Although the propensities of the employee for sexual assault did not have to be shown by acts as specific as rape, the court said, it did require some indication of assaultive behavior in general. See also *Coath v. Jones,* 277 Pa.Super. 479, 419 A.2d 1249, 1250 (1980); *Welsh Manufacturing Division of Textron, Inc. v. Pinkerton's, Inc.,* 474 A.2d 436 (R.I.1984); *F & T Company v. Woods,* 92 N.M. 697, 594 P.2d 745 (1979) ("It is not enough that plaintiff prove that defendant was negligent in hiring or retaining Sanders. In addition, plaintiff must prove that the negligent hiring or retention of Sanders was the proximate cause of the rape." 594 P.2d at 747–748); *Williams v. Wiewel,* 36 Ill. App.3d 478, 344 N.E.2d 34 (Ill.App.Ct. [4th Dist] 1976, cert. den.) [quoting Restatement

(Second) of Torts, sec. 448 (1965)]; *Ponticas v. K.M.S. Investments*, 331 N.W.2d 907 (Minn.1983) ("Liability is predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others." 331 N.W.2d at 911).

This court recently addressed a foreseeability question in *Williams v. Sun Valley Hospital*, 723 S.W.2d 783 (Tex.App.—El Paso 1987, writ ref'd n.r.e.), a case involving a patient who had voluntarily committed himself to a local mental hospital. He escaped from the hospital and killed himself by jumping in front of a car on a busy street. The driver of the car sued the hospital for her injuries caused by the impact of the body. This Court held, in effect, that the driver of the car was not a foreseeable victim of any negligence on the part of the hospital in allowing the patient to escape.

In another case not involving negligent hiring but with operative facts somewhat analogous to the instant case, *Kane v. Hartford Accident and Indemnity Company*, 98 Cal.App.3rd 350, 159 Cal.Rptr. 446 (Cal.Ct.App. [1st Dist.] 1979), plaintiff sued the bonding company, Hartford, for damages arising out of a rape at a hospital by an employee of a window washing company that had been contracted to wash the hospital windows. It was undisputed that the company would not have hired the employee to work at the hospital if he had not been bonded. Hartford had previously performed background checks on all of the persons it bonded but it had discontinued this practice several months before. It was also undisputed that if Hartford had performed the check, it would have found a criminal history of convictions for burglary, auto theft and robbery (which the court termed "property-related crimes"). Hartford would not have bonded the employee if it had known of the convictions. The Court found causation-in-fact because the employee would not have been working at

the hospital at the time of the rape if Hartford had discovered the crimes. The Court said Hartford had no liability because the foreseeable risk, if any, was for property-related crimes and not crimes against persons. "Least of all did Hartford have any indication that Williams' criminal impulses had, or would, come to focus on the plaintiff." 159 Cal.Rptr. at 449.

Under the facts of this case, there is no proximate cause between Appellant's negligent hiring and Appellee's injuries as a matter of law. I would sustain Point of Error No. One which would require a reversal and rendering.