**Comfort AGBOR and Kingsley Agbor Individually and as Next of Friend of Dikeh Eze Agbor, Appellants,**

v.

**ST. LUKE'S EPISCOPAL HOSPITAL, Appellee.**

No. 14–94–00410–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Nov. 30, 1995.

Rehearing Overruled Jan. 4, 1996.

Phillip A. Pfeifer, Houston, for appellant.

Jeffrey B. McClure, Solace H. Kirkland, Michael O. Connelly, Houston, for appellee.

Before LEE, AMIDEI and EDELMAN, JJ.

**OPINION**

LEE, Justice.

Comfort and Kingsley Agbor, individually and as next friend of their minor son, Dikeh

Agbor (the Agbors), appeal a summary judgment granted to St. Luke's Episcopal Hospital (St. Luke's), asserting the trial court erroneously interpreted the Texas Medical Practice Act (the Texas Act)[1] as requiring a showing of malice in a claim for negligent credentialing, and, alternatively, the Texas Act violates the Open Courts Provision of the Texas Constitution.[2] We reverse and remand.

On November 19, 1990, Dikeh was delivered by Dr. Suzanne Rothchild at St. Luke's. The Agbors allege that in dislodging Dikeh's shoulder from the birth canal, Dr. Rothchild injured Dikeh's brachial plexus, permanently disabling his arm. The Agbors also allege that St. Luke's was negligent and grossly negligent in renewing Dr. Rothchild's staff privileges because she was not a Texas resident, was not properly insured for medical malpractice and was a defendant in several malpractice actions.

The Agbors sued Dr. Rothchild for medical malpractice and St. Luke's for "negligent credentialing." In its motion for summary judgment, St. Luke's urged that the Texas Act provides immunity for credentialing actions taken by health-care entities absent a showing of malice. *See* TEX.REV.CIV.STAT. ANN. art. 4495b § 5.06(*l*) & (m) (Vernon Supp.1995). The trial court granted the motion for summary judgment and severed the Agbors' action against St. Luke's from the action against Dr. Rothchild. The Agbors bring this appeal.

 Because it is potentially dispositive of this appeal, we will initially address St. Luke's first reply point that this court lacks jurisdiction to hear this appeal because the Agbors' notice of appeal was not timely filed. St. Luke's motion for summary judgment was orally granted on September 20, 1993, and the Agbors' action against St. Luke's was severed on December 10, 1993. A written take-nothing summary judgment was signed on December 17, 1993, but reflected the cause number of the original action, 92–19823, rather than that of the severed action, 92–19823–A. A second summary judgment

reflecting the severed cause number was signed on January 26, 1994. The Agbors filed a motion for reconsideration and new trial on February 16, 1994, and an appeal bond on April 15, 1994.

St. Luke's argues that since the second summary judgment granted no relief beyond that granted in the first, the second summary judgment is a nullity. It further maintains that the trial court's use of the incorrect cause number was merely a clerical error, and should have been corrected by judgment nunc pro tunc. *See* TEX.R.CIV.P. 316. Thus, St. Luke's contends that the trial court's plenary power expired on January 16, 1994, thirty days after the first summary judgment order was signed. *See* TEX.R.CIV.P. 329b; *Uvere v. Canales,* 825 S.W.2d 741, 744 (Tex. App.—Dallas 1992, orig. proceeding). Accordingly, it contends that the trial court had no power to modify its judgment, except for correction of clerical errors by nunc pro tunc. *See Id.* St. Luke's argues that since the trial court's plenary power had expired, entry of the January 26, 1994, summary judgment did not extend the time for the Agbors to perfect an appeal. *See Stephens v. Henry S. Miller Co.,* 667 S.W.2d 250, 252 (Tex.App.—Dallas 1984, writ dism'd by agr.). Thus, St. Luke's contends the Agbors' appeal bond was not timely filed. We disagree.

The summary judgment entered on December 17, 1994, was in cause number 92–19823 rather than the severed cause number 92–19823–A. Thus, the summary judgment entered on December 17 ordered that the Agbors take nothing from St. Luke's in cause number 92–19823 when St. Luke's was no longer a party to that cause. Therefore, the December 17 summary judgment had no effect on the severed cause. *See Philbrook v. Berry,* 683 S.W.2d 378 (Tex.1985) (per curiam) (holding that filing of an answer and motion for new trial under original cause number rather than severed cause did not extend court's plenary power in severed cause); *see also City of San Antonio v. Rodriguez,* 828 S.W.2d 417 (Tex.1992) (per curiam) (reversing the court of appeals dismiss-

---

1. TEX.REV.CIV.STAT.ANN. art. 4495b §§ 1.01–6.13 (Vernon Supp.1995).

2. TEX. CONST. art. I, § 13.

al of a cause where original notice of appeal was docketed under the wrong number); *but see Texas Instruments, Inc. v. Teletron Energy Management, Inc.,* 877 S.W.2d 276 (Tex.1994) (questioning validity of *Philbrook* in light of *Rodriguez* and holding that court of appeals could extend time for filing of statement of facts). Thus, there is only one order granting summary judgment to St. Luke's in the severed cause, 92–19823–A, which is on appeal to this court. Based upon this January 26, 1994 judgment, the motion for new trial and appeal bond were timely filed. *See* TEX.R.APP.P. 31, 41. Moreover, we have been warned by the supreme court that "decision[s] of the courts of appeals should turn on substance rather than procedural technicality." *Texas Instruments,* 877 S.W.2d at 278; *Rodriguez,* 828 S.W.2d at 418; *see also Silk v. Terrill,* 898 S.W.2d 764, 766 (Tex.1995) (per curiam) (holding judicial economy is not served when a case ripe for decision is decided on a procedural technicality; cases should be decided on the merits when procedural deficiencies can be easily corrected). Therefore, we hold that the Agbors timely perfected their appeal and we overrule St. Luke's reply point.

■ The Agbors' sole point of error is that the trial court erred in granting St. Luke's motion for summary judgment. Initially, the Agbors contend the summary judgment was improper because the trial court incorrectly interpreted the Texas Act to require a showing of malice in "negligent credentialing" actions brought by patients against hospitals.

The Texas Act is modeled after the Health Care Quality Improvement Act of 1986 (the Federal Act). *See* 42 U.S.C.A. §§ 11101–52 (West 1995). Congress issued the following findings in conjunction with the Federal Act:

1. The increasing occurrence of medical malpractice and the need to improve the quality of medical care had become national problems that warranted greater efforts than could be undertaken by individual states;

2. There was a national need to restrict the ability of incompetent physicians to move from state to state without disclosure or discovery of the physician's previous damaging or incompetent performance;

3. This problem could be remedied through effective professional peer review;

4. The threat of damage liability, including treble damage liability under the federal antitrust law, unreasonably discourages physicians from participating in effective professional peer review; and

5. There is an overriding national need to provide incentive and protection for physicians engaging in effective professional peer review.

42 U.S.C.A. § 11101 (West 1995). Consistent with these findings, the Federal Act grants immunity from civil liability to professional review bodies and persons participating with these review bodies when the standards set forth in the Federal Act are met. *Id.* § 11111. The Federal Act does not, however, change liabilities or immunities under existing law, or override any state law which provides greater immunity for those engaged in professional review action than that provided by the Federal Act. *Id.* § 11115(a). Nor does the Federal Act affect any rights and remedies of patients to seek recovery under federal or state law for negligent treatment or care by any physician or health care entity. *Id.* § 11115(d).

The Texas Act provides immunity to a health-care entity for "any statement, determination or recommendation" made in the course of peer review and for participating in "medical peer review activity." TEX.REV.CIV. STAT.ANN. art. 4495b § 5.06(*l*) & (m) (Vernon Supp.1995).[3] "Medical peer review" means:

---

3. In their entirety, subsections (*l*) and (m) provide:

(*l*) [a] cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of peer review as defined by this Act.

(m) [a] person, health-care entity; or medical peer review committee, that, without malice, participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board

the evaluation of medical and health-care services, including evaluation of the qualifications of professional health-care practitioners and of patient care rendered by those practitioners. The term includes evaluation of the merits of complaints relating to health-care practitioners and determinations or recommendations regarding those complaints.

*Id.* § 1.03(a)(9). St. Luke's argues, however, that these provisions also extend immunity from liability to suits by patients for "negligent credentialing" unless the patient shows malice. We disagree.

 In construing a statute, our primary objective is to determine the legislature's intent. *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Texas,* 888 S.W.2d 921, 926 (Tex.App.—Austin 1994, n.w.h.). Generally, when a statute is unambiguous, we give effect to the statute according to its terms. *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 133 (Tex.1994); *Maley v. 7111 Southwest Freeway, Inc.,* 843 S.W.2d 229, 231 (Tex.App.—Houston [14th Dist.] 1992, writ denied). We are not limited, however, to reading the unambiguous language of a statute. *City of Fort Worth v. Harty,* 862 S.W.2d 776, 778 (Tex.App.—Fort Worth 1993, writ denied). We should:

1. read the provision in context with the remainder of the statute; *Bridgestone/Firestone,* 878 S.W.2d at 133;

2. not adopt a construction that would render a law or provision absurd or meaningless; *Southwestern Bell,* 888 S.W.2d at 927; *Maley,* 843 S.W.2d at 231; and

3. not "attribute to the Legislature an intention to work an injustice." *Meno v. Kitchens,* 873 S.W.2d 789, 792 (Tex. App.—Austin 1994, writ denied).

In addition, the legislature has expressly stated that when construing a statute we **may consider:** the object sought to be attained; the circumstances under which the statute was enacted; the legislative history; common law or former statutory provisions, including other laws on the same or similar

matters; and the consequences of a particular construction. TEX.GOV'T CODE ANN. § 311.023 (Vernon 1988); *Dallas Mkt. Ctr. Dev. Co. v. Beran & Shelmire,* 824 S.W.2d 218, 221 (Tex.App.—Dallas 1991, writ denied); *see also Bridgestone/Firestone,* 878 S.W.2d at 135 (Hecht, J., concurring) ("in some circumstances, words, no matter how plain, will not be construed to cause a result the Legislature almost certainly could not have intended."). When these principals are applied to section 5.06, we conclude that the hospital is not immune from liability as it asserts.

First, we are not convinced that the Texas Act unambiguously states that a hospital is immune from liability for "negligent credentialing," absent malice. Subsections (*l*) and (m) can be read to provide immunity for peer review activities only, such as providing information and records. This immunity would allow a health-care entity, peer review committee and members to make peer review determinations without "retaliatory" suits from disgruntled physicians, but would not extend to separate negligent acts by the health-care entity.

Second, when read in context, subsections (*l*) and (m) do not provide the immunity urged by the hospital. Because subsections (*l*) and (m) provide immunity if the activities are "without malice," the hospital admits that the Agbors would have a valid claim if they proved that the hospital acted with malice in "negligently credentialing" Dr. Rothchild. *See* TEX.REV.CIV.STAT.ANN. art. 4495b § 5.06(*l*) & (m) (Vernon Supp.1995). However, this is an impossible burden because of the confidentially provisions of the Texas Act. Subsection (j) provides that all records, determinations and communications of a medical peer review committee are not discoverable or admissible in a civil suit. *Id.* § 5.06(j). Thus, if the hospital's interpretation of the act is adopted, an injured patient is placed in the impossible position of proving malice in the credentialing process without discovery. We cannot say that the legislature intended such an absurd result.[4] *See*

---

is immune from any civil liability arising from such an act.

4. This interpretation is also consistent with section 5.06(t) which provides that the following persons are immune from civil liability:

*Bridgestone/Firestone,* 878 S.W.2d at 135 (Hecht, J., concurring).

Third, the Texas Act incorporates the Federal Act. *See* TEX.REV.CIV.STAT.ANN. art. 4495b § 5.06(a) (Vernon Supp.1995). The Federal Act states that only the liabilities and immunities specifically provided for in the subchapter are changed. All other liabilities and immunities are not changed. *See* 42 U.S.C.A. § 11115(a) (West 1995). The Federal Act also provides that it does not affect the rights and remedies available to a *patient* for the negligence of a physician, health-care provider or health-care entity. *Id.* § 11115(d). The Federal Act does not include "immunity" provisions similar to section 5.06(*l*) and (m). Therefore, if the Texas Act were construed as urged by St. Luke's, one portion of the act would provide immunity from suits by patients while another portion of the act states that the rights and remedies available to a patient are not affected. Thus, to construe the act as urged by St. Luke's would make the Texas Act internally contradictory.

Fourth, the legislative history does not support the conclusion that the "immunity" provisions should extend to actions by patients. The legislative history clearly indicates that the purpose of the act was to keep *physicians* from suing for peer review activities. For example, Dr. James Winn, a past member of the Board of the Texas Medical Association testified to the Senate:

> We particularly ask that enhanced protection against civil lawsuits be extended to those **courageous physicians** who do come forward and who testify regarding unskillful and negligent care that another physician has bestowed upon a patient. When such **physicians** act out of a sense of both professional and civic responsibility in providing information to the State Board of Medical Examiners and then are subse-

quently sued by the defendant physician with its attendant cost and mental anguish and financial loss, the message to the doctors of Texas is loud and clear: do not get involved. We must have this type of legislation which will mandate that any action taken against a physician by a group of his peers, be it a hospital staff or a county medical society, or any type of peer review organization, if that action is taken on the basis of incompetency, that it be immediately reported to the Board of Medical Examiners for appropriate investigation and action.

Similarly, Senator Brooks stated that "a liability shield" was necessary to be "even handed" if physicians and health-care entities were required to report improper actions to the Board of Medical Examiners and peer review committees. Representative McKinney, a physician, stated that the act required peer review reporting and provided immunity from retaliatory suits. He said that a survey of physicians indicated that more doctors would participate in the process if retaliatory suits were barred. On the other hand, there is no indication in the history that the legislature was being asked to make health-care entities immune from suit by patients because of its peer review activities. Thus, the clearly announced purpose of the provisions was to protect from retaliatory suits by disgruntled physicians. There is no indication that the legislature intended to protect hospitals from suits by patients for "negligent credentialing." Our ultimate goal as a court is to construe and apply the law as intended by the legislature. The interpretation urged by the hospital fails to meet this goal.

Finally, if we adopt the hospital's interpretation, a grave injustice may result. Dikeh Agbor was allegedly injured by the negli-

---

(1) a person reporting to or furnishing information to a medical peer review committee or the board in good faith;

(2) a member, employee, or agent of the board, a member, employee, or agent of a medical peer review committee, a member, employee, or agent of a medical organization committee, or a medical organization district or local intervenor who takes any action or makes any recommendation within the scope

of the functions of the board, committee, or intervenor program, if such member, employee, or agent acts without malice in the reasonable belief that such action or recommendation is warranted by the facts known to him or her; and

(3) any member or employee of the board or any person who assists the board in carrying out its duties or functions provided by law.

gence of Dr. Rothchild. The Agbors presented summary judgment evidence that Dr. Rothchild had been sued several times for malpractice in deliveries at the hospital. The Agbors also presented summary judgment evidence that Dr. Rothchild did not have malpractice insurance, in violation of the hospital's by-laws and credentialing requirements. If the section 5.06 immunity extends to "negligent credentialing," the Agbors may be without a meaningful or effective remedy. The purpose of both the Texas and the Federal Acts is to improve the quality of care. Immunity from "negligent credentialing," without proof of malice, circumvents this objective. Hospitals would not be discouraged from granting staff privileges to physicians who do not have malpractice insurance or any number of other unreasonable shortcomings. Unless hospitals are held accountable for failing to follow reasonable credentialing requirements, the purpose of the act will be thwarted.

For the forgoing reasons, we do not believe a health-care entity is immune from suits by patients for allegations of "negligent credentialing," absent malice. The Agbors' point of error is sustained. The summary judgment is reversed and remanded for proceedings consistent with this opinion.[5]

EDELMAN, Justice, dissenting.

## OVERVIEW

I respectfully dissent. When the Legislature has spoken on a subject, its determination is binding upon the courts unless it has exceeded its constitutional authority. *Public Util. Comm'n v. Cofer*, 754 S.W.2d 121, 124 (Tex.1988). When a statute is unambiguous,

a court should not use rules of construction or extrinsic aids to construe it, but should give the statute its common meaning. *Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 133 (Tex.1994). A statute is presumed to have been enacted with complete knowledge of existing law and with reference to it. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex.1990).

The Health Care Quality Improvement Act of 1986 [1] (the "Federal Act") grants immunity from civil liability to professional review bodies and persons participating with them where the standards set forth therein are met. 42 U.S.C.A. § 11111. However, the Federal Act does not otherwise change liabilities or immunities under existing law, or override any state law which provides greater immunity for those engaged in professional review action than that provided by the Federal Act. *Id.* § 11115(a). Nor does the Federal Act affect any rights and remedies of patients to seek recovery under federal or state law for negligent treatment or care by any physician or health care entity. *Id.* § 11115(d).

The Texas Medical Practice Act [2] expressly incorporated the provisions of the Federal Act and added several of its own. *See* art. 4495b § 5.06. The two such provisions in question here (the "immunity provisions") provide that "[a] cause of action does not accrue ... against the health-care entity from any ... determination ... made ... without malice, in the course of peer review as defined by this Act;" and "[a] ... health-care entity ... that, without malice, participates in medical peer review activity ... is immune from any civil liability arising from such an act." *Id.* § 5.06(*l*), (m).[3]

---

5. Because of our disposition of the Agbors' initial contention, we do not reach their second contention that immunity from "negligent credentialing," absent malice, violates the open court provision. Reaching this constitutional question is not "absolutely necessary." *See Texas State Bd. of Barber Examiners v. Beaumont Barber College, Inc.*, 454 S.W.2d 729, 732 (Tex.1970).

1. 42 U.S.C.A. §§ 11101–52 (West 1995 & Supp. 1995).

2. Tex.Rev.Civ.Stat.Ann. art. 4495b §§ 1.01–6.13 (Vernon Supp.1995).

3. Subsections (*l*) and (m) provide:
 (*l*) [a] cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of peer review as defined by this Act.
 (m) [a] person, health-care entity, or medical peer review committee, that, without malice, participates in medical peer review activity or furnishes records, information, or assistance to a medical peer review committee or the board is immune from any civil liability arising from such an act.

For this purpose, "medical peer review" is defined to include "evaluation of the qualifications of professional health-care practitioners...." *Id.* § 1.03(a)(9). Thus, read together, the plain meaning of the immunity provisions is to provide immunity to a hospital[4] from civil liability with regard to peer review, including liability to patients' for "credentialing" decisions, *i.e.*, whether a particular doctor is qualified to practice at the hospital, where the credentialing decisions are made without malice.

As indicated in the majority opinion, the applicable legislative history clearly indicates that the immunity provisions of both the Federal Act and Texas Act were primarily intended to foreclose retaliatory lawsuits by doctors whose staff privileges are not renewed. However, apart from that and the language of the statute itself, we have *no* indication whether the immunity provisions of the Texas Act were also intended to apply to patients' actions against hospitals.

Historically, although hospitals have always been liable for the acts of their employees and agents, they have not been accountable for the acts of physicians who were independent contractors because the hospitals could not control the details of the methods by which those physicians practiced.[5] However, in some jurisdictions, that rule has given way to a view that hospitals *are* liable to patients for failing to properly credential doctors. *See, e.g., Darling v. Charleston Community Memorial Hosp.,* 33 Ill.2d 326, 211 N.E.2d 253 (1965), *cert. denied,* 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966).

Prior to the 1987 amendment of the Texas Act adding the immunity provisions, it appears that the only Texas appeals court to have implemented that cause of action was the San Antonio Court of Appeals.[6] Our court had said only that it declined to adopt such a cause of action where the plaintiff had chosen his own doctor.[7] Moreover, although the Texas Supreme Court had refused writ in the cases that recognized negligent credentialing, it had not itself addressed that cause of action in an opinion, and still has not.

Therefore, it is not clear whether patients had a "well-recognized" cause of action for negligent credentialing in Texas before the immunity provisions were added to the Texas Act in 1987. Depending upon the Legislature's perception of that issue at the time, of which we have no indication, it is equally arguable that (1) there was no perceived cause of action and, thus, the immunity provisions were not intended to apply to it, (2) there was a perceived cause of action and the

---

4. For purposes of this discussion, the term "hospital" is intended to broadly refer to all "health care entities," as defined in Section 1.03(a)(5) of the Texas Act.

5. *See* Richard L. Griffith & Jordan M. Parker, *With Malice Toward None: The Metamorphosis of Statutory and Common Law Protections for Physicians and Hospitals in Negligent Credentialing Litigation,* 22 Tex.Tech L.Rev. 157, 161 (1991).

6. *See Smith v. Baptist Memorial Hosp. Sys.,* 720 S.W.2d 618, 626 n. 2 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.) (noting that hospital *may* have duty to prevent physician's malpractice to extent it establishes procedures for granting and reviewing staff privileges); *Park North Gen. Hosp. v. Hickman,* 703 S.W.2d 262, 266 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (holding that Park North had duty to plaintiff to exercise reasonable care in selection of and granting privileges to its medical staff, and to periodically monitor and review staff's competency).

In *Penn Tanker Co. v. United States,* 310 F.Supp. 613 (S.D.Tex.1970), a public hospital was held liable to a patient for a doctor's negligence. However, it is unclear in that case whether the doctor was an employee or agent of the hospital in that he was under the direct supervision of its administrator.

*Since* the 1987 amendment, negligent credentialing has been recognized by the Amarillo and El Paso Courts of Appeals, both based on *Park North. See Lopez v. Central Plains Regional Hosp.,* 859 S.W.2d 600, 602 n. 2 (Tex.App.—Amarillo 1993, no writ); *Deerings West Nursing Ctr. v. Scott,* 787 S.W.2d 494 (Tex.App.—El Paso 1990, writ denied). The immunity provisions in the Texas Act were apparently not asserted in those cases.

7. *Jeffcoat v. Phillips,* 534 S.W.2d 168, 173 (Tex. Civ.App.—Houston [14th Dist.] 1976, writ ref'd n.r.e.) (holding that where no employer-employee, principal-agent, partnership or joint venture relationship exists between hospital and physician, hospital is not liable for granting or continuing surgical privileges where patient has chosen physician and hospital is not otherwise liable). In this case, the briefs do not reflect whether Dr. Rothchild was selected by the Agbors or simply on call at St. Luke's at the time of delivery.

immunity provisions were intended to apply to it, or (3) there was a perceived cause of action and the immunity provisions were *not* intended to apply to it, but the statute was nevertheless inartfully drafted to have that effect. As a practical matter, however to whatever extent there had been an actionable right of recovery for negligent credentialing in Texas, the immunity provisions did not destroy that claim, but simply raised the standard of culpability from negligence to malice. In this sense, the immunity provisions afford only partial immunity from patients' suits.

## NO CONFLICT WITH FEDERAL ACT

The immunity provisions of the Texas Act do not conflict with the provision of the Federal Act which states that patient malpractice claims are not affected. This is because the immunity provisions of the Texas Act apply only to peer review activities and not to patients' claims for negligent treatment or care. That is, to the extent that a patient has a direct claim under prevailing law for negligent treatment or care against a doctor or hospital (such as where an employee or agent of the hospital is negligent), the immunity provisions of the Texas Act do not apply to that claim.

Moreover, although the Federal Act clearly does not extend immunity to suits by patients against hospitals,[8] Section 11115(a) of the Federal Act specifically contemplates that greater immunity might be provided by state law. Therefore, it is not a conflict that Texas differs from the Federal Act in extending partial peer review immunity to patients' suits against hospitals.

Nor does a conflict arise from the fact that subsections 5.06($l$) and (m) extend immunity to health care entities, whereas subsection (t) does not.[9] The key issue in this case is not whether health care entities were intended to be included in the immunity provisions since it is clear that they were intended to at least be afforded immunity from claims by doctors. Instead, the key issue here is whether the immunity provisions also apply to patient claims. Since the differences between subsections ($l$), (m) and (t) do not relate to that question, they do not affect the meaning or validity of the immunity provisions for purposes of this lawsuit.

## NO ABSURD RESULT

Unquestionably, the primary policy justification for granting immunity to peer review is to encourage medical professionals and entities to participate in that process without fear of liability to those whose clinical privileges are adversely affected by their decisions. It is arguable that extending partial immunity to patients' claims against hospitals for credentialing would not further this policy of encouraging effective peer review, but would lessen the accountability of hospitals

---

**8.** The legislative history of the Federal Act states, in part:

> The fact that a professional review action was or was not taken against a physician under this bill shall in no way affect the right of a patient to file a malpractice claim or action for damages. Nor shall such failure affect any defenses to such a malpractice action. For example, a patient might seek to include a hospital in a malpractice action where the hospital has information related to the professional conduct or competence of a physician, takes a professional review action that meets the standards of this bill, exonerates the physician, and the patient is subsequently injured by the physician. Although the hospital and professional review body would not be subject to damages in a suit by the physician, *this immunity would not apply to any suit by the patient.*

H.R.Rep. No. 903, 99th Cong., 2d Sess. 9–10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6392 (emphasis added).

**9.** Section 5.06(t) provides:

> The following persons are immune from civil liability:
> (1) a person reporting to or furnishing information to a medical peer review committee or the board in good faith;
> (2) a member, employee, or agent of the board, a member, employee, or agent of a medical peer review committee, a member, employee, or agent of a medical organization committee, or a medical organization district or local intervenor who takes any action or makes any recommendation within the scope of the functions of the board, committee, or intervenor program, if such member, employee, or agents acts without malice in the reasonable belief that such action or recommendation is warranted by the facts known to him or her; and
> (3) any member or employee of the board or any person who assists the board in carrying out its duties or functions provided by law.

for staffing decisions. This is clearly a legitimate concern.

However, it can also be argued that even proper medical procedures are sometimes unsuccessful and produce unfavorable results. If a doctor performs enough procedures, particularly those which are intricate or complex, it arguably follows that some will inevitably prove unsuccessful, and even result in medical malpractice lawsuits. If so, then to hold hospitals liable for negligence in their credentialing decisions would arguably discourage them from rehiring more experienced doctors in favor of those who have "cleaner" records due to less experience. Such a result could arguably do more to lessen than improve overall health care, and is arguably not justified to the extent that patients have legal remedies for medical malpractice against their doctors.

It is, of course, not the role of this court to choose between these competing policy considerations. However, we should recognize in this case that they are not so one-sided as to demonstrate that providing hospitals partial immunity against patients' claims for credentialing decisions was so absurd a result that the Legislature could not have intended it.

Similarly, the majority opinion concludes that the malice requirement creates an "impossible burden" for a claimant because records and discussions of peer review proceedings are privileged. See TEX.REV.CIV.STAT. ANN. art. 4495b § 5.06(g) & (j) (Vernon Supp. 1995). Importantly, however, this same privilege exists even if only negligence, and not malice, is required in order for the patient to establish liability against a hospital.[10] Moreover, this privilege applies equally to claims by doctors whose clinical privileges have been adversely affected by peer review. Therefore, from a discovery and evidentiary standpoint, the privilege creates no more of

an "impossible burden" for patients than for the doctors to whom the immunity provisions are clearly intended to apply.

It has also been argued that a patient would be unable to prove malice *toward him* because credentialing decisions are not made with regard to particular patients to be treated in the future by the doctor under review. However, although malice is not defined in the Texas Act, it cannot be assumed that the Legislature intended malice to exist only where a defendant specifically intends to injure the claimant. In the definition of malice enacted in the Texas Civil Practice and Remedies Code in the same legislative session as the immunity provisions, for example, "malice" is defined as (a) conduct specifically intended by the defendant to cause substantial injury to the claimant, *or* (b) "an act that is carried out by the defendant with a flagrant disregard for the rights of others and with actual awareness on the part of the defendant that the act will, in reasonable probability, result in human death, great bodily harm or property damage." TEX.CIV.PRAC. & REM. CODE ANN. § 41.001(6) (Vernon Supp.1995). Moreover, malice may be established by direct or circumstantial evidence. *Missouri Pac. R.R. Co. v. Lemon*, 861 S.W.2d 501, 517 (Tex.App.—Houston [14th Dist.] 1993, writ dism'd by agr.). Therefore, proof of malice toward a particular patient is not required by the immunity provisions.

The majority opinion similarly rejects application of the immunity provisions to patient claims based on *Bridgestone*. *Bridgestone* was a products liability crashworthiness case based on defective seat belts. At issue was article 6701d, Section 107C(j) of the Texas Revised Civil Statutes, which provides that the use or nonuse of a safety belt is not admissible evidence in a civil trial. TEX.REV. CIV.STAT.ANN. art. 6701d § 107C(j) (Vernon Supp.1995). Despite the statute's language, the Texas Supreme Court held that its pur-

10. In this case, for example, despite the privilege, the plaintiffs had allegedly been able to determine that Dr. Rothchild had "many" malpractice cases brought against her prior to the delivery of Dikeh Agbor, that most of these cases involved deliveries at St. Luke's, that several of the cases had been settled for hundreds of thousands of dollars, and that Dr. Rothchild had practiced for over two years at St. Luke's without

malpractice insurance. Such facts, if supported by proper summary judgment proof, could raise a fact issue concerning malice, especially in conjunction with the presumption under the Federal Act that a hospital which fails to request such information reported pursuant to the Federal Act is nevertheless presumed to have knowledge of it. *See* 42 U.S.C.A. § 11135(b). No such fact issue was asserted in this case.

pose was to preclude a *defendant* from introducing a plaintiff's failure to use a seat belt as evidence of contributory negligence; thus, it did not bar a *plaintiff's* use of such evidence in a seat belt crashworthiness case. *Bridgestone,* 878 S.W.2d at 134. In his concurrence to that opinion, Justice Hecht stated "[t]he real principle at work here is this: in some circumstances, words, no matter how plain, will not be construed to cause a result the Legislature almost certainly could not have intended." *Id.* at 135. In this case, however, as discussed above, it is not clear that requiring patients to prove malice in order to recover against hospitals for credentialing decisions is a result the Legislature could not have intended.

## NO OPEN COURTS VIOLATION

Although the applicable point of error is not reached in the majority opinion, I do not believe that subsections 5.06(*l*) and (m) of the Texas Act violate the Open Courts Provision of the Texas Constitution. The Open Courts Provision states that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have a remedy by due course of law." TEX. CONST. art. I, § 13. A litigant challenging a statute as unconstitutionally restricting a common law cause of action must demonstrate that (1) the statute restricts a well-recognized common law cause of action, and (2) the restriction is unreasonable when balanced against the purpose and basis of the statute. *Thomas v. Oldham,* 895 S.W.2d 352, 357 (Tex.1995). Since it was not demonstrated, as discussed above, either that negligent credentialing was a "well-recognized" common law cause of action in 1987 when the immunity provisions were added to the Texas Act,[11] or that any resulting restriction is unreasonable, there is no violation of the Open Courts Provision.

In conclusion, without a clear indication of legislative intent to the contrary, we must construe the immunity provisions, like other statutes, according to their plain meaning. Because the immunity provisions were so

construed by the trial court and do not violate the Open Courts Provision of the Texas Constitution, I would affirm the judgment of the trial court.

---

11. A 1991 commentary observed that, based on *Park North,* negligent credentialing was a "viable" cause of action in Texas. Griffith & Parker, *supra* note 5, at 169. Even if true, I do not believe that "viable" amounts to "well-recognized" for purposes of the Open Courts Provision.