# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-3816

ESTRELLA ADELA JAVIER and DANIELA JAVIER,
minor children of Wilbert Javier Prado,
appearing by guardian *ad litem* ERNESTO ROMERO,
and ESTATE OF WILBERT JAVIER PRADO,
by PATRICIA D. JURSIK, special administrator,

*Plaintiffs-Appellants,*

*v.*

CITY OF MILWAUKEE,
a Wisconsin Municipal Corporation,

*Defendant-Appellee,*

and

ESTATE OF ALFONZO C. GLOVER,

*Defendant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07-C-0204—**William E. Callahan, Jr.**, *Magistrate Judge.*

ARGUED MAY 4, 2011—DECIDED MARCH 2, 2012

Before EASTERBROOK, *Chief Judge,* and FLAUM and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Alfonzo Glover, an off-duty Milwaukee police officer, fired nineteen shots at Wilbert Javier Prado in a late-night encounter that began when Prado tailgated Glover as he was driving home after his 4 p.m.-to-midnight shift. Eight of the shots hit Prado; he died at the scene. Glover was placed on desk duty.

At an inquest hearing, Glover testified that Prado tailed him, tried to run him over, and brandished a gun, so he pursued Prado and fired the shots in accordance with a Milwaukee Police Department rule that requires officers to take action against lawbreakers even when off duty. Other evidence contradicted Glover's account—most notably, investigators did not find a gun or other weapon on or near Prado's body. The inquest jury found that Glover's actions were justified, but a year later the Milwaukee County District Attorney charged him with homicide and perjury. Glover was suspended from the police force. On the day of his arraignment, Glover committed suicide.

Prado's minor children and his estate (collectively, "the Javiers") sued Glover's estate alleging excessive-force and loss-of-life claims under 42 U.S.C. § 1983. They also named the City of Milwaukee as a defendant under a Wisconsin statute that requires the City to pay judgments assessed against its employees for acts committed within the scope of their employment. *See* WIS. STAT. § 895.46. In other words, if Glover was acting as a cop—rather than for his own purposes—when the

shooting took place, the Javiers could recover from the City rather than solely from Glover's modest estate.

At trial the Javiers asked the court to instruct the jury that a police officer who misuses or exceeds his authority may be found to have acted within the scope of his employment. They also requested an instruction on ratification, advancing a theory that the City tacitly adopted Glover's actions after the fact by not immediately suspending him. The district court denied both requests, concluding that the modified scope-of-employment instruction was unnecessary and the ratification doctrine was inapplicable. The jury found that Glover used unreasonable force under color of law and awarded substantial damages, but also found that he had not acted within the scope of his employment, so the City was not liable for the judgment. The Javiers appealed.

We reverse the judgment in favor of the City and remand for a new trial on the scope-of-employment issue. This is an excessive-force claim against a police officer; in this context, the scope-of-employment inquiry carried a significant risk that jurors would mistakenly intuit that if the officer used excessive force, he must also have acted outside the scope of his employment. As we will explain, the risk of juror confusion was magnified by the admission of the homicide and perjury charges without an appropriate limiting instruction and by improper argument by the City. Under these circumstances, the district court's refusal to give the modified scope-of-employment instruction was prejudicial error. We reject the Javiers' argument on the ratification

issue, however; under Wisconsin law an employer who retains an employee after he commits a tort does not ratify his conduct.

## I. Background

By departmental rule, Milwaukee police officers are required "at all times within the boundaries of the City, [to] preserve the public peace, prevent crime, detect and arrest violators of the law, and protect life and property." MILWAUKEE, WIS. POLICE DEP'T RULE 2/015.00 (2005). Another rule provides: "The fact that [officers] may be technically 'off duty' shall not . . . reliev[e] them from the responsibility of taking required police action in any matter coming to their attention at any time." *Id.* at 2/025.00. This "always on duty" requirement was central to the Javiers' claim that Glover was acting within the scope of his employment when he pursued and shot Prado.

Glover's testimony before the inquest jury also figured prominently in the Javiers' claims. Glover gave the following account of the shooting: On March 5, 2005, he worked his 4 p.m.-to-midnight shift and afterward changed out of his uniform and into a plainclothes T-shirt and jacket, though he was still wearing his dark-blue police pants and leather police boots. He also wore a holster with a loaded semiautomatic Glock pistol approved for Milwaukee police officers' off-duty use. He began driving home; as he left the freeway and drove onto city streets on Milwaukee's south side, he noticed

a van behind him. The van followed closely for several blocks, flashing its high-beam lights. Twice Glover pulled over to allow the van to pass, but each time the van stopped behind him.

Glover pulled over a third time at an intersection near two taverns. The van again parked behind him. When Glover stepped out of his car, the van suddenly accelerated toward him. To avoid being hit, Glover jumped onto the van's hood and rolled across it. While rolling, Glover called out that he was a cop, although he was not sure if the driver—later identified as Prado—heard him. Glover briefly made eye contact with Prado and saw "this very mean, almost evil look on his face[,] . . . as if he wanted to completely run me over."

As Glover fell to the ground, he drew his gun. The van crashed to a stop on the opposite side of the inter-section. Glover got to his feet and saw Prado extend his arm "with what appeared to look like a gun in his right hand." Fearing that Prado was about to shoot him, Glover fired ten shots at Prado. Prado initially drew back into the van, but when Glover approached, Prado got out of the vehicle. Glover repeatedly identified him-self as a police officer and ordered Prado to get on the ground. Prado did not comply.

Instead, Prado took one hand out of his pocket, holding what Glover "believed to be a dangerous weapon," and pointed it at Glover. Glover yelled, "drop your weapon, Milwaukee police," and fired again at Prado. Prado began running toward an alley while pointing his right arm back in Glover's direction. Glover fired more

shots, and Prado fell to the ground. Glover called 911, informing the operator that he was an off-duty police officer involved in a shooting. Nearby residents and tavern patrons came out onto the street in response to the shooting; Glover told them, too, that he was an off-duty cop.

The Police Department dispatched some 40 officers to the scene, which it described as an "officer-involved shooting." The physical evidence established that Glover fired a total of nineteen shots, eight of which hit Prado in the chest, back, thighs, and hands. Seven of the bullets entered Prado's body from behind. The medical examiner concluded that Prado died of massive bleeding in his chest. A toxicology study established that Prado was highly intoxicated, with a blood-alcohol concentration of 0.22 percent. Investigators did not find a firearm or anything resembling a weapon on or near Prado's body.

The inquest jury apparently accepted Glover's description of the facts; it found his actions justified. The district attorney, however, continued to investigate and in May 2006—fourteen months after the shooting— charged Glover with first-degree intentional homicide and perjury. Glover had been on desk duty since the shooting; when the district attorney issued the criminal charges, the Police Department suspended him. Glover committed suicide on the day of his arraignment.

Prado's minor daughters, Estrella and Daniela Javier (ages three and one at time of the shooting), by their guardian *ad litem* and joined by the administrator of

Prado's estate, filed this civil-rights suit under § 1983 against Glover's estate and the City of Milwaukee.[1] As relevant here, the Javiers alleged that Glover used unreasonable force in violation of the Fourth Amendment and deprived Prado of his life without due process of law in violation of the Fourteenth Amendment.[2] The Javiers also alleged that the City was liable for any judgment under section 895.46 of the Wisconsin Statutes, which provides that a municipality "shall" pay any judgment imposed against its employees if "the jury or the court finds [the employee] was acting within the scope of employment."

The parties consented to proceed before a magistrate judge. *See* 28 U.S.C. § 636(c)(1). At trial the Javiers read Glover's inquest testimony into the record, telling jurors that they were not hearing live testimony from Glover because he was deceased. (The magistrate judge barred the City from explaining that Glover committed suicide.) The City argued that the shooting was the result of a personal dispute, perhaps a case of road rage, and relied on witness testimony and physical evidence that contradicted the version of events Glover gave at the inquest. For example, some witnesses testified

---

[1] Like the district court, we have excused Glover's estate from participating in this case to avoid dissipating its value.

[2] The complaint also included a *Monell* policy-or-practice claim against the City. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The jury found for the City on this claim, and the Javiers do not challenge this part of the verdict on appeal.

that they did not hear shouts of "police" or any yelling at all before the gunshots; one witness testified that the shots came almost immediately after the car crash. In addition, the City presented evidence about the pattern of bullet holes left in Prado's van that was inconsistent with Glover's description of the shooting. Finally, the City emphasized that no firearm or other weapon was found on or near Prado's body, casting significant doubt on Glover's testimony that Prado had brandished a gun.

The City also informed the jury that the district attorney charged Glover with homicide and perjury in connection with Prado's death and the inquest. The ostensible purpose of admitting this evidence was to show that the City suspended Glover as soon as the charges were filed and therefore did not approve of or adopt his actions as its own. The City also argued that the criminal charges were relevant to Glover's motivation to lie during his inquest testimony. The Javiers did not object to the admission of this evidence. To the contrary, they thought the evidence surrounding the filing of criminal charges bolstered their ratification theory. They wanted to argue that the City failed to repudiate—and therefore ratified—Glover's conduct by keeping him on the payroll until criminal charges were filed fourteen months after the shooting.

Although the Javiers agreed to the admission of the criminal charges, they proposed a limiting instruction and a modified scope-of-employment instruction explaining that an officer's intentional—even criminal—use of excessive force under color of law could still be con-

sidered conduct within the officer's scope of employment. More specifically, as a limiting instruction regarding the jury's use of the evidence of the criminal charges, the Javiers asked the judge to instruct jurors that "[a] police officer can be acting under the color of law and within the scope of employment even if the officer acts intentionally or criminally." They also proposed a modified scope-of-employment instruction that captured the same concept, adapting the Wisconsin pattern instruction by adding the following language: "A police officer can be acting within the scope of his employment even if the officer acted intentionally or criminally, and even if the officer's use of force was excessive or the officer misused his authority to use force." Finally, the Javiers asked the judge to give the following instruction on their ratification theory: "[I]f a municipality ratifies the act of an employee[] by failing to repudiate the employee's actions or by approving, adopting or accepting the employee's decision and the basis for it, . . . the employee is considered to have been acting within the scope of his employment . . . ."

The judge rejected the Javiers' proposed limiting instruction and instead gave the jury the following generic reminder:

> [Y]ou have heard evidence that Alfonzo Glover was criminally charged with homicide and perjury by the Milwaukee County District Attorney's Office in May 2006 in connection with the death of Mr. Prado. Alfonzo Glover was never tried on those charges because he died before the case was concluded. You

may not in any way substitute the decision of the Milwaukee County District Attorney's Office for your own decision in this case.

The judge also rejected the Javiers' modified scope-of-employment instruction, opting instead to use the Wisconsin pattern instruction, which does not explain the legal distinction between the concepts of an officer's use of excessive force and his scope of employment. Finally, the judge refused to instruct the jury on ratification, holding that the doctrine of ratification did not apply to the facts of this case.

The jury found that Glover used unreasonable force under color of law and awarded $1.85 million in damages.[3] The jury also found, however, that Glover was not acting within the scope of employment when he shot Prado, leaving the Javiers to collect their judgment from Glover's small estate rather than from the City. The Javiers moved for a new trial on the City's liability under section 894.46, reasserting their arguments about the jury instructions. The judge denied the motion, and the Javiers appealed.

## II. Discussion

The Javiers challenge the magistrate judge's refusal to give their proposed jury instructions regarding the scope-

---

[3] This sum consisted of $250,000 to Daniela and Estrella Javier and $600,000 to Prado's estate in compensatory damages, and an additional $1,000,000 to Prado's estate in punitive damages.

of-employment issue and the jury's use of the evidence of the criminal charges filed against Glover. "We review jury instructions de novo to determine whether, taken as a whole, they correctly and completely informed the jury of the applicable law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). "We defer to the district court's choice of language in the instructions so long as the law is completely and accurately conveyed." *Schmitz v. Canadian Pac. Ry. Co.*, 454 F.3d 678, 682 (7th Cir. 2006). If the instructions were erroneous or incomplete, we move to the question of prejudice: Did the legal shortcoming in the instructions likely confuse or mislead the jury and prejudice the objecting litigant? *Id.* If so, a new trial is in order. *Id.* at 686.

The claims of instructional error in this case all relate in one way or another to the scope-of-employment issue, which arises here outside its traditional common-law context. So we begin with some background. At common-law, the familiar doctrine of respondeat superior imposes vicarious liability on employers for the torts of their employees acting within the scope of their employment. *See Kerl v. Dennis Rasmussen, Inc.*, 682 N.W.2d 328, 333-37 (Wis. 2004); RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006). At issue here, however, is a claim under a Wisconsin statute that requires the State and local units of government to pay judgments imposed against their employees for acts committed within the scope of their employment:

> If the defendant in any action or special proceeding is a public officer or employee and is proceeded

against in an official capacity or is proceeded against as an individual because of acts committed while carrying out duties as an officer or employee and *the jury or the court finds that the defendant was acting within the scope of employment, the judgment* as to damages and costs entered against the officer or employee . . . *shall be paid by the state or political subdivision of which the defendant is an officer or employee.*

WIS. STAT. § 895.46(1)(a) (2011) (emphasis added). Though often referred to as an indemnity statute, by its terms section 895.46 requires the State or local government to directly satisfy a judgment against its employee if the "scope of employment" condition is met.

The predecessor statute to section 895.46 was enacted in 1943 at a time when Wisconsin municipalities were protected by governmental immunity; thus, "*respondeat superior* ha[d] no application."[4] *Holytz v. City of Milwaukee*,

---

[4] The Wisconsin Supreme Court partially abrogated common-law governmental immunity in 1962, *see Holytz v. City of Milwaukee*, 115 N.W.2d 618, 625 (Wis. 1962), and the legislature promptly codified the immunity in response to that court decision, *see* WIS. STAT. § 893.80; *Lodl v. Progressive N. Ins. Co.,* 646 N.W.2d 314, 320 (Wis. 2002). The scope and proper application of governmental immunity continues to vex Wisconsin courts to this day. *See Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 691 N.W.2d 658, 678-80 (Wis. 2005) (tracing some of the confusion); *id.* at 688-89 (Prosser, J., concurring) (restating a long-standing objection to the expansion and misapplication of the doctrine); *see also Willow Creek*

(continued...)

115 N.W.2d 618, 621 (Wis. 1962); *see also Graham v. Sauk Prairie Police Comm'n*, 915 F.2d 1085, 1091 (7th Cir. 1990). In its original form, the statute required the State and subordinate local governments to pay judgments assessed against their employees if the employee was sued for acts in his official capacity and was found to have acted in good faith. *Graham*, 915 F.2d at 1091. The "good faith" and "official capacity" requirements were later seen as providing too little protection for public employees. *Id.*

So in order to more broadly shield public employees from monetary loss when sued because of their employment, Wisconsin amended the statute in 1973, borrowing the scope-of-employment concept from the common law for purposes of determining the liability of the State and local governments for judgments imposed against their employees. *Id.* The "good faith" requirement was deleted, individual-capacity suits were added, and the statutory language was expanded to provide that the State and its municipalities "shall" pay a judgment imposed against its employee if "the jury or the court finds that the [public employee] was acting within the scope of employment." WIS. STAT. § 895.46(1)(a). The Wisconsin Supreme Court generally looks to the common-law agency understanding of "scope of employment" to interpret the same phrase in section 895.46. *See,*

---

[4]  (...continued)
*Ranch, L.L.C. v. Town of Shelby*, 611 N.W.2d 693, 702-04 (Wis. 2000); *id.* at 706-15 (Prosser, J., dissenting).

*e.g.*, *Olson v. Connerly*, 457 N.W.2d 479, 482 (Wis. 1990); *Cameron v. City of Milwaukee*, 307 N.W.2d 164, 168-69 (Wis. 1981).

With this background in place, we return to the claims of instructional error. Recall that the Javiers asked the judge to instruct the jury that a "police officer can be acting within the scope of his employment even if the officer acted intentionally or criminally, and even if the officer's use of force was excessive or the officer misused his authority to use force." They asked the judge to repeat this point in a limiting instruction regarding the jury's use of the evidence of the criminal charges filed against Glover: "A police officer can be acting under the color of law and within the scope of employment even if the officer acts intentionally or criminally."

These instructions are fully accurate statements of the law—in Wisconsin and elsewhere. *See, e.g.*, *Cameron*, 307 N.W.2d at 168-69 ("The scope of employment has also been defined to include those acts which are 'so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, *even though quite improper ones*, of carrying out the objectives of the employment.'" (quoting WILLIAM L. PROSSER, HANDBOOK ON THE LAW OF TORTS 460-61 (4th ed. 1971))) (emphasis added); *Johnston v. Chi., St. Paul, Minneapolis & Omaha Ry. Co.*, 110 N.W. 424, 426 (Wis. 1907) ("A master is liable for the tortious act of the servant done in the scope of his employment, though the master did not sanction it, or

even though he forbade it."); RESTATEMENT (THIRD) OF
AGENCY § 7.07 cmt. c (2006) ("[C]onduct is not outside
the scope of employment merely because an employee
disregards the employer's instructions."); RESTATEMENT
(SECOND) OF AGENCY § 230 (1958) ("An act, although
forbidden, or done in a forbidden manner, may be
within the scope of employment."); RESTATEMENT (SEC-
OND) OF AGENCY § 231 (1958) ("An act may be within
the scope of employment although consciously criminal
or tortious.").

   The City does not argue otherwise. Instead, the City
asserts that the scope-of-employment instruction the
district court used was also legally accurate and that the
omission of the Javiers' proposed language neither
misled nor confused the jury. The first point is correct;
the second is not. With one exception not material here,
the district court's scope-of-employment instruction
tracked the Wisconsin pattern instruction, and in that
sense it was legally correct.[5] But it was also materially
incomplete; it did not explain the important legal
principle—critical in this case—that an employee can
misuse or exceed his authority while still acting within
the scope of his employment.

---

[5] The district court's full instruction on the scope-of-employ-
ment issue is included as an appendix to this opinion. With
the exception of the fourth paragraph, it duplicates the Wis-
consin pattern instruction on scope of employment. *See*
WIS. JI-CIVIL 4035. The fourth paragraph comes from *Olson
v. Connerly*, 457 N.W.2d 479, 482-83 (Wis. 1990).

The concept is not intuitive. *See, e.g.*, *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 360-61 (Cal. 1995) ("[W]ell established, if somewhat surprising on first encounter, is the principle that an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment . . . even though the employer has not authorized the employee to commit crimes or intentional torts."). And we have noted that scope-of-employment issues can be especially challenging in cases alleging police misconduct. *See, e.g.*, *Doe v. City of Chicago*, 360 F.3d 667, 673 (7th Cir. 2004) (explaining the difficulty of deciding the scope of a police officer's employment under a similar Illinois statute in a case alleging sexual harassment by a police officer).

Our decision in *Graham* exemplifies the principle that a police officer can grossly exceed his authority to use force and still be found to have acted within the scope of his employment. In *Graham* an on-duty police officer killed a suspected drug trafficker during an arrest, shooting him twice in the head after he was handcuffed and while he was lying face down on the ground. 915 F.2d at 1088. There was no question that the officer violated the suspect's constitutional rights; the municipal employer argued that it could not be held liable for the judgment under section 895.46 because the officer exceeded his authority to use force and therefore was not acting within the scope of employment. *Id.* at 1088-89. We disagreed and upheld the district court's conclusion as a matter of law that the statute applied. *Id.* at 1095.

We made it clear in *Graham* that "[m]erely because [the officer] misused his authority to use deadly force in apprehending [the suspect] does not put him outside of the scope of his employment." *Id.*; *see also Wilson v. City of Chicago,* 120 F.3d 681, 685 (7th Cir. 1997) (holding a municipality liable under a similar Illinois indemnity statute for a civil-rights judgment against its officer for using torture to extract confession); *Coleman v. Smith,* 814 F.2d 1142, 1148-50 (7th Cir. 1987) (holding a munici-pality liable under the same Illinois statute for a default judgment against its officers who conspired to falsely arrest a suspect); *Hibma v. Odegaard,* 769 F.2d 1147, 1152-53 (7th Cir. 1985) (reinstating a jury verdict holding a county liable under section 895.46 for a judgment against its deputy sheriffs for planting evidence and framing a suspect); *cf. Cameron*, 307 N.W.2d at 166-70 (holding that although off-duty officers were clearly liable under § 1983 for provoking a fight by taunting suspects with racial epithets, a jury question remained regarding the scope-of-employment issue under section 895.46).

Here, too, the key question in the Javiers' statutory claim against the City was whether Glover was acting as a vigilante for his own purposes or as a police officer when he shot Prado. *See Olson*, 457 N.W.2d at 483 ("[A]n employee's conduct is not within the scope of . . . employ-ment if it is too little actuated by a purpose to serve the employer . . . .").[6] Glover's inquest testimony suggested

---

[6] *Olson* adopted its approach from the Restatement (Second) of Agency § 228 (1958). The Restatement (Third) of Agency § 7.07

(continued...)

that he pursued and shot Prado pursuant to his off-duty responsibilities under the "always on duty" rule because Prado had tried to run him over and appeared to point a gun at him. The City challenged Glover's version of events, noting its inconsistency with other evidence and arguing that the shooting was part and parcel of a purely personal dispute. But because the jury had to decide whether Glover used excessive force under color of law *and* whether his actions were within the scope of his employment, there was a great risk that jurors would conflate the two.

---

[6] (...continued)
cmt. b (2006) has since commented that the language used in this section of the Second Restatement is "not entirely consistent" because "an act motivated by *some* purpose to serve the employer could still be '*too little actuated*' to be within the scope of employment." The Third Restatement therefore uses an alternative formulation: "An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." RESTATEMENT (THIRD) OF AGENCY § 7.07(2) (2006). This revised restatement of the law has not yet found its way into Wisconsin's appellate caselaw, however; the Wisconsin Supreme Court continues to cite *Olson* and use the Second Restatement's language. *See, e.g.*, *Behrendt v. Gulf Underwriters Ins. Co.*, 768 N.W.2d 568, 578 (Wis. 2009) ("The question as to vicarious liability is whether at the time of the act alleged, the employee's conduct was within the scope of his employment, which we have defined as conduct that is 'actuated, at least in part, by a purpose to serve the employer.'" (quoting *Olson*, 457 N.W.2d at 484)).

This risk was exacerbated by the City's introduction and use of the evidence that Glover was charged with homicide in connection with Prado's death. At the beginning of his opening statement, the Assistant City Attorney told the jury that Glover had "maybe murdered Wilbert Prado" and that "there is no evidence that you will hear or see that will establish that [Glover] had any obligation to argue with people, to fight with people over personal matters[,] and certainly not to murder them." When certain high-ranking police supervisors were on the witness stand, counsel asked whether the Police Department's investigators had concluded "that they could prove that Alfonzo Glover had murdered Wilbert Prado" and also asked what happened after the "District Attorney's Office issu[ed] a charge that, an assertion that they could prove a case of murder." In his closing argument, counsel set up a false dichotomy on the scope-of-employment issue, arguing: "The City of Milwaukee['s] interest is not served by murdering someone[.] [T]he City of Milwaukee's interest is served by enforcing a law[;] it is not served by a personal argument."

This approach to the evidence of the criminal charges was legally improper and highly misleading. The City conveyed the incorrect impression that because Glover had been criminally charged, he could not have been acting within the scope of his employment. The two are not mutually exclusive. Without an instruction telling the jury that the law is precisely the opposite—that Glover's conduct could be criminal, excessive, and outside his authority and still be within the scope of his employment—the jury was missing a critical "relevant

legal principle[]" and was likely "confuse[d] or mis[led]." *See Huff*, 493 F.3d at 899.

To be sure, the judge did tell the jury not to "substitute the decision of the Milwaukee County District Attorney's Office for [its] own decision in this case." This instruction was too vague to be of any help in deciding the key issue in the Javiers' statutory claim against the City. The jury needed to hear *from the court* that the scope-of-employment concept recognizes that an officer can exceed or abuse his authority—even intentionally or criminally—and still be acting within the scope of his employment. The judge should not have refused the Javiers' proposed limiting instruction or their modified scope-of-employment instruction.

There is one exception, however; we agree with the district court that the Javiers were not entitled to a ratification instruction. The Javiers asked the judge to instruct the jury that "if a municipality ratifies the act of an employee, by failing to repudiate the employee's actions . . . , then the employee is considered to have been acting within the scope of his employment when the acts took place." As we have noted, the Javiers wanted to argue that by not firing Glover immediately after the shooting, the City failed to repudiate—and therefore ratified—his actions.

This theory is foreclosed by Wisconsin law, which holds that an employer's retention of an employee after his wrongful conduct does not constitute ratification. *See Mandel v. Byram*, 211 N.W. 145, 147 (Wis. 1926) (explaining that if wrongful conduct occurs while a "servant was

acting in his own personal business, the master does not become liable [through ratification] merely by reason of the fact that he thereafter retains the servant in his employ"); WIS. JI-CIVIL 4050 cmt. ("Retention of a servant in the master's employ after wrongful conduct committed outside the scope of employment is not evidence of ratification . . . .").[7]

This is the general common-law rule. *See also* RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. d (2006) ("[A] principal's failure to terminate or reprimand an employee by itself is not likely to ratify the employee's unauthorized action because the employer may have varied reasons for failing to take action adverse to an employee."); Anthony W. Kraus, *Ratification of Torts: An Overview and Critique of the Traditional Doctrine and its Recent Extension to Claims of Workplace Harassment*, 32 TORT & INS. L.J. 807, 817 ("The majority rule . . . is that retaining a tortfeasor employee is not, in and of itself, a sufficient act of ratification."). The ratification doctrine has no application in this case.[8]

---

[7] To the extent that language in *Robinson v. Superior Rapid-Transit Railway Co.*, 68 N.W. 961, 963 (Wis. 1896), supports the Javiers' ratification theory, that language is no longer valid in light of *Mandel v. Byram*, 211 N.W. 145 (Wis. 1926).

[8] With the ratification theory out of the case, the rationale for admitting the evidence of the homicide and perjury charges largely evaporates. The City argued that the evidence of the criminal charges was relevant to show that the City did not expressly or impliedly adopt Glover's actions because the

(continued...)

Accordingly, we REVERSE the judgment in favor of the City and REMAND the case to the district court for retrial on the section 895.46 claim.[9]

---

[8] (...continued)

Police Department suspended him immediately after the charges were filed. For their part the Javiers wanted this evidence admitted in support of their argument that the City ratified Glover's conduct by failing to repudiate it during the fourteen months after the shooting. This reasoning—on both sides—strikes us as implausible. In any event, it no longer applies. The City also argued that the evidence of the criminal charges tended to show that Glover had an incentive to lie during the inquest. This is simply illogical. The possibility that Glover might be criminally charged in Prado's death existed at the time of the inquest; that was the point of the inquest, and it's fine for the jury to know that much. That the district attorney in fact issued charges (albeit much later, and against the recommendation of the inquest jury) has no bearing on the *ex ante* question of Glover's state of mind when he testified at the inquest. Moreover, given the powerful effect of this evidence on the mind of the average juror, any remaining relevance (and we can't think of what that might be) seems substantially outweighed by the risk of unfair prejudice and the potential to mislead the jury. *See* FED. R. EVID. 403.

[9] *See* 7TH CIR. R. 36; *Lindquist Motors, Inc. v. Middleton Motors, Inc.*, 658 F.3d 760, 766 (7th Cir. 2011).

**Appendix—District Court's Jury Instructions on
Scope of Employment**

A[n] employee is within the scope of his employment when he is performing work or rendering services he was engaged to perform and render within the time and space limits of his authority and is actuated by a purpose to serve his employer in doing what he is doing. He is within the scope of his employment when he is performing work or rendering services in obedience to the express orders or direction of his employer, or doing that which is warranted within the terms of his express or implied authority, considering the nature of the services required, the instructions which he has received, and the circumstances under which his or her work is being done or the services are being rendered.

An employee is outside the scope of employment when he deviates or steps aside from the prosecution of his employer's business for the purpose of doing an act or rendering a service intended to accomplish an independent purpose of his own, or for some other reason or purpose, not related to the business of the employer.

Such deviation or stepping aside must be sufficient to amount to a departure from the employer's services for purposes entirely personal to him or for some other reason or purpose, not related to the business of the employer.

An employee may be found to have acted within the scope of his or her employment as long as the

employee was at least partially actuated by a purpose to serve the employer. There is no requirement that serving the employer must be the employee's only purpose or even the employee's primary purpose. Rather, an employee's conduct is not within the scope of his or her employment if it is too little actuated by a purpose to serve the employer or if it is motivated entirely by the employee's own purposes (that is, the employee stepped aside from the prosecution of the employer's business to accomplish an independent purpose of his or her own).

Such deviation or stepping aside from the employer's business may be momentary and slight, measured in terms of space [or] time, but if it involves a change of mental attitude or purpose in serving his personal interests, or the interests of another, instead of his employer's, his conduct falls outside the scope of his employment.